# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
JOSEPH WELCH, On Behalf of Himself          :
and All Others Similarly Situated,          :
                                            :
                    Plaintiffs,             :
                                            :
            vs.                             :
                                            :
TD AMERITRADE HOLDING CORPORATION,          :
TD AMERITRADE, INC, TD BANK USA, N.A.       :
and THE TORONTO-DOMINION BANK,              :
                                            :
                    Defendants.             :
-----------------------------------------------------------x



JUDGE KOELTL

**07 CIV 6904**
ECF CASE

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
AUG 01 2007
U.S.D.C. S.D.N.Y.
CASHIERS

I.

## INTRODUCTION AND NATURE OF THE ACTION

1.       Plaintiff Joseph Welch, on behalf of himself and all others similarly situated, by

his attorneys, Schoengold Sporn Laitman & Lometti, P.C., for his class action complaint against

Defendants TD Ameritrade Holding Corporation ("TD Holding"), TD Ameritrade, Inc. ("TD

Ameritrade"), TD Bank USA, N.A. ("TD Bank") and The Toronto-Dominion Bank ("Toronto-

Dominion") collectively, the "TD Ameritrade Defendants" or "Defendants," alleges, upon

knowledge as to himself and upon information and belief based upon, among other things, the

investigation of his attorneys, including a review of the Defendants' public documents, United

States Securities and Exchange Commission ("SEC") filings, wire and press releases published

by and regarding Defendants, news articles and information readily obtainable on the Internet.

2.       The action is brought by Plaintiff individually and on behalf of all persons who

maintained and/or maintain cash balances in their TD Ameritrade brokerage accounts (the

"Class") that since on or about January 24, 2006 up to the present (the "Class Period"), and/or

are currently being swept into TD Ameritrade's accounts falsely and deceptively referred to as

either "*Money Market Accounts*" ("MMA") or "*Money Market Deposit Accounts*" ("MMDA"), or into accounts referred to as "TD Ameritrade Cash."

3.      This action alleges violations of the Investment Advisers Act of 1940 ("Investment Advisers Act"), 15 U.S.C. § 80b-1 *et seq.*, New York State General Business Law ("GBL") Section 349, which prohibits deceptive business practices, New York Stock Exchange ("NYSE") Rules 342.17, 401(a), 405, 472 and 476(a), National Association of Securities Dealers ("NASD") Rules 2110, 2210 and 2310, and common law fraud, negligence, unjust enrichment, breach of fiduciary duty and negligent misrepresentation.

4.      Defendants repeatedly represented to its investor clients including Plaintiff and the Class that TD Ameritrade was a financial institution worthy of their trust since they provided their clients "personalized" and "unbiased" financial information to help their clients achieve their "clients' financial goals". These claims were blatantly false and served to further a deceptive and misleading plan and scheme, in violation of the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*, the GBL and in breach of their fiduciary duties and NASD and NYSE rules, whereby TD Ameritrade automatically swept its clients uninvested cash not into *bona fide* money market accounts currently *yielding 4%-5%*, but rather into sham "money market" accounts which were in fact *unsuitable "savings" accounts* at TD Bank, or into "TD Ameritrade Cash" accounts at TD Ameritrade. The sham money market accounts or TD Ameritrade Cash accounts paid interest of as little as *0.10% or 0.00%*, respectively.[1] TD Ameritrade Defendants also falsely represented to their clients that the sham money market account and TD Ameritrade Cash account represented "*great options*" for "*earning interest on cash balances.*" Nothing could have been further from the truth.  Not only were these accounts among the worst financial

vehicles for holding uninvested cash, but they were implemented only so that the Defendants could profit from lending and investing TD Ameritrades' clients' cash for their own profit at commercial lending rates ranging from *8% to in excess of 10%*. Indeed, had Defendants swept the cash of TD Ameritrade's clients into bona fide money market accounts, Defendants would have been precluded from lending or investing their client's cash.

5.    The use of these sham "money market" and "TD Ameritrade Cash" accounts as part of their deceptive cash sweep scheme was a financial bonanza for the Defendants and proved to be a critical element of their achieving substantial profits. As reported in an article by *TheStreet.com* published on February 16, 2007, TD Ameritrade's clients held "a whopping *$5.7 billion a day in cash* in the last fiscal year" which earned TD Ameritrade *"$185 million in fees* from a partner [TD Bank], who reinvested their clients' cash at higher rates." The article further reported that the *"$185 million accounted for 10% of Ameritrade revenue for the 2006 fiscal year"* and approximately *"21% of the company's $526.7 million in net income for 2006*, if you adjust the $185 million down by the company's 38.5% tax rate." (Emphasis added). In fact, TD Holding told analysts that it expected to earn even more from TD Ameritrade's sweep program in the future – approximately *"$515 million or more"* in profit during fiscal 2007. (*Id.*) (Emphasis added). Toronto-Dominion and TD Bank also benefited by obtaining sweep funds from TD Ameritrade at interest rates as low as 0.1% (plus the fees described above paid to TD Ameritrade), which they then could re-lend or re-invest at interest rates in excess of 10%.

6.    Though the deceptive nature of Defendants' improper practices have been effective in duping TD Ameritrade clients, those practices have not gone totally without notice in the financial press. An article in the March 6, 2006 *Investment News* entitled "Firms Squeeze

---

[1]    The sweep into bank "money market" or "money market deposit" accounts was the default option for cash sweeps. TD Ameritrade offered "TD Ameritrade Cash" sweeps as an option, but this "option" paid even *lower*

Sweep Accounts for Profits," recognized that TD Ameritrade was "squeezing" its customers with

the Cash Sweep Programs, which was not "in the best interests of clients," as follows:

> Charles Schwab & Co. Inc. and **TD Ameritrade Holding Corp. are squeezing greater profits from their default sweep accounts,** and some financial advisors are criticizing the moves as not being in the best interests of clients.
>
> The opportunity to make a highly profitable change is one of the benefits of being **a trusted household name,** according to Jon D. Holtaway, managing director of Danielson Associates Inc., a Rockville Maryland based provider of consulting services to banks.
>
> **"This is one of the reasons you spend on a brand, so you can have these profit centers that people look past,"** he said...

(Emphasis added).

## II.

## JURISDICTION AND VENUE

7.    The claims asserted herein arise under and pursuant to alleged violations of Investment Advisers Act of 1940, 15 U.S.C. § 80-b-1 *et seq.*, Section 349 of the General Business Law of New York, violation of NYSE and NASD rules and the regulations promulgated thereunder, common law fraud, negligence, unjust enrichment, and negligent misrepresentation.

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d) (diversity). Plaintiff is a citizen of Washington, and both Plaintiff and other members of the proposed Class numbering in the thousands are citizens of a State different from any of the Defendants. *See* 28 U.S.C. § 1332(d)(2)(A). Additionally, the matter in controversy exceeds the sum of $5,000,000, exclusive of interests and costs. Separately, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as one of the

---

interest rates.

4

causes of action arose from Defendants' violation of federal law, *i.e.*, the Investment Advisers Act, 15 U.S.C. 80b-14.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the dissemination of materially false and misleading public documents, disclosure statements, brochures and other information, occurred in this District. In addition, TD Bank maintains its principal executive officers in this District, and TD Ameritrade and Toronto-Dominion are subject to personal jurisdiction in this District. Further, venue is proper in this District pursuant to 15 U.S.C. § 80b-14.

## III.

## PARTIES

10.    Plaintiff Joseph Welch resides in Washington State, King County, and maintains multiple brokerage accounts with Defendant TD Ameritrade. Mr. Welch's uninvested cash balances were swept pursuant to TD Ameritrade's Money Market Deposit Account sweep program during the Class Period. As of May 31, 2007, Mr. Welch was receiving only 0.4% interest on uninvested cash awaiting investment.

11.    Defendant TD Ameritrade, Inc. ("TD Ameritrade") is a Delaware Corporation with its principal executive offices located at 4211 South 102nd Street, Omaha, Nebraska 68127. TD Ameritrade maintains branch offices in New York and throughout the United States. TD Ameritrade is a member of the NYSE and NASD, and is a registered broker-dealer. TD Ameritrade's operations include the U.S. retail brokerage clients of two previously separate brokerage firms: Ameritrade, Inc. ("Ameritrade") and TD Waterhouse Group, Inc. ("TD Waterhouse"). TD Ameritrade is an "Investment Adviser" under the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*, and, as such, owed to Plaintiff and other members of the Class a

fiduciary duty to fully and fairly disclose to all conflicts of interest and all material facts, and an affirmative obligation to employ reasonable care to avoid misleading clients.

12.    Defendant TD Ameritrade Holding Corporation ("TD Holding") is a Delaware corporation with its principal executive offices located at 4211 South 102nd Street, Omaha, Nebraska 68127. TD Holding's common stock is listed on the NASDAQ national market and trades under the symbol, "AMTD." TD Ameritrade is a wholly-owned subsidiary of TD Online Holding Corp., which in turn is a wholly-owned subsidiary of TD Holding. Prior to January, 2006, TD Holding was known as Ameritrade Holding Corporation ("Ameritrade Holding").

13.    Defendant TD Bank is a wholly-owned subsidiary of The Toronto-Dominion Bank ("Toronto-Dominion" or "TD"). TD Bank's principal executive offices are located at 31 West 52nd Street, New York, New York 10019. TD Bank was chartered as Waterhouse National Bank in 1994 to provide attendant financial services to TD Waterhouse's brokerage service customers. TD Bank currently maintains no branch offices; its products and services are primarily delivered via the internet, telephone and mail.

14.    Defendant Toronto-Dominion is a Canadian-chartered bank headquartered in Toronto, Canada, with its principal executive offices located at The Toronto-Dominion Centre, King Street West and Bay Street, Toronto, Ontario M5K 1A2. Toronto-Dominion employs 58,000 people in offices around the world. Toronto-Dominion and its subsidiaries are collectively known as TD Bank Financial Group. TD Bank Financial Group offers a full range of financial products and services to more than 14 million customers worldwide. Toronto-Dominion maintains an office and has a representative authorized to receive service of process at 31 West 52nd Street, New York, New York 10019. Toronto-Dominion's common stock is traded on both the Toronto and New York Stock Exchanges under the symbol, "TD." Toronto-

Dominion, as a foreign issuer, files periodic reports with the Securities and Exchange Commission.

15.    Prior to January 24, 2006, Ameritrade was the indirect wholly-owned subsidiary of Ameritrade Holding, and TD Waterhouse was the indirect wholly-owned subsidiary of Toronto-Dominion.  TD Bank – which provided bank cash sweep services to TD Waterhouse but not to Ameritrade customers – was a wholly-owned subsidiary of TD Waterhouse.

16.    On or about January 24, 2006, a series of transactions were closed through which Ameritrade Holding acquired TD Waterhouse's U.S. brokerage operations, and Toronto-Dominion acquired Ameritrade's Canadian brokerage operations (the "TD Waterhouse Transactions").  As part of these transactions, (a) TD Waterhouse transferred its Canadian retail securities brokerage business and TD Bank to Toronto-Dominion; (b) Ameritrade Holding purchased all of the stock of TD Waterhouse from Toronto-Dominion in exchange for the issuance of 196,300,000 shares of Ameritrade Holding common stock (which represented approximately 32.5% of Ameritrade Holding's outstanding shares after giving effect to the transaction); (c) Ameritrade Holding was renamed as TD Ameritrade Holding; and (d) the parties entered into a "money market deposit account agreement" (the "MMDA Agreement"), under which TD Ameritrade and other TD Ameritrade broker-dealer affiliates were required to offer, as "designated sweep vehicles," bank sweep accounts through TD Bank.  The closing of these transactions took place in this District.

17.    As of October 31, 2006, Toronto-Dominion owned 39.8% of TD Holding, and TD is a controlling shareholder of TD Ameritrade.  Pursuant to a shareholders' agreement entered into in connection with the January 24, 2006 transactions, Toronto-Dominion designates five of TD Holding's twelve board of director members.

7

## IV.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.      Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who maintained and/or maintain a brokerage account from and through TD Ameritrade, where the clients' uninvested cash was automatically swept into Defendant-controlled and affiliated bank accounts at TD Bank, or into "TD Ameritrade Cash" or equivalent accounts, paying interest below prevailing money market yields, from and including January 24, 2006 through the present. Excluded from the Class are Defendants, their officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Defendants have or had a controlling interest.

19.      The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are many thousands of Class members. Class members may be identified from records maintained by Defendants.

20.      Plaintiff's claims are typical of the claims of the Class, as all Class members were and are similarly affected by Defendants' wrongful conduct in violations of the Investment Advisers Act of 1940, the GBL, the NYSE and NASD rules and regulations and common laws, as set forth herein. Plaintiff and each of the Class members entered into uniform contracts to open a brokerage account, received uniform disclosures, and maintained cash balances with one or more of the Defendants. Defendants' cash sweeping practices were deceitfully presented and/or concealed from the Class by Defendants, which made affirmative misrepresentations and

failed to make full and honest disclosure throughout the Class Period.  Plaintiff and the other Class members have sustained monetary damages resulting from Defendants' deceitful and improper practices.

21.    Plaintiff will fairly and adequately represent and protect the interests of the other Class members and have retained counsel competent and experienced in class action litigation.

22.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.    Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*;

(b)    whether the GBL was violated by Defendants' deceitful and improper conduct as alleged herein;

(c)    whether Defendants' conduct violated NYSE and NASD rules and regulations through the improper conduct alleged herein;

(d)    whether Defendants were unjustly enriched by their conduct;

(e)    whether Defendants breached their fiduciary duties owed to Plaintiff and other Class members by their conduct;

(f)    whether    Defendants    committed    negligence,    fraud,    negligent misrepresentations, and whether statements made by Defendants to Plaintiff and other members of the Class members in their brokerage agreements, account statements, mailings, web pages and brochures during the Class Period were materially false and misleading and misrepresented material facts in that the bank deposits were more profitable to Defendants but not to the

9

customers, who could have received higher rates through other alternatives such as the money market funds;

(g)    whether Defendants had a duty to disclose material facts concerning their cash sweeping and tiering practices;

(h)    whether Defendants' bank sweep contracts with Plaintiff and other members of the Class should be voided;

(i)    to what extent the Class has sustained damages; and

(j)    to what extent Defendants unjustly benefited and should be held to account for their wrongful conduct, and should be directed to disgorge profits.

23.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. As the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

24.    Each Class member maintains or maintained a brokerage account with and has or had an uninvested cash balance swept into TD Ameritrade's "Money Market Accounts" or "Money Market Deposit Account," or into a "TD Ameritrade Cash" account.

## V.

## FACTUAL ALLEGATIONS

**A.    Differences Between Money Market and Savings Accounts**

25.    As investment vehicles, there are fundamental and critical differences between bank *"savings accounts"* and *bona fide "money market"* funds or accounts in terms of the financial benefits provided to the investor.  While cash held in a bank *savings account* is FDIC insured up to the maximum amount permitted by law and *money market* funds are not, there has been no question as to the safety of money market accounts.  *Money market* funds are open-ended investment companies which invest in safe, short-term debt instruments, such as U.S. Treasury, federal agency or high-quality corporate securities, and seek to maintain a stable price of $1 per share while providing a competitive rate of income.  Indeed, money market funds are very low risk investments – there has not been an insolvency of a money market fund in the last 35 years.  Further, unlike savings accounts, which only pay an interest rate denominated by the bank, it is a requirement that money market funds maximize the yields for their shareholders, and thus the yields are not capped in any way.  In recent years, the financial gains to investors from money market accounts have far outpaced interest paid on savings account cash - with savings accounts paying interest as low as less than 1%; while money market fund yields are now exceeding 5%.  Money markets funds have come to represent an excellent means for investors to hold cash safely while at the same time obtaining higher yields than those available in checking or savings accounts.  Currently Americans hold over $3.2 trillion in money market funds.  Thus, while money market funds are clearly more advantageous to the investor or *brokerage firm client* as high yielding safe havens for cash, they stymie the unfettered profit interest of the brokerage

11

firms themselves since monies held in money market funds are held in trust so that the brokerage firm cannot use the funds for its own investment or lending purposes.

26.    Money market funds are also liquid, meaning an investor can withdraw funds from them on short notice.  There is typically no penalty for taking money out of a money market fund – unlike for Certificates of Deposit (CDs), for which substantial early withdrawal fees are charged.  Money market fund interest is generally calculated daily but is only paid out at the end of the month unless an investor sells an interest in the fund, when it is paid at that time. As a result, money market funds have proven to be the most safe and profitable vehicle for holding uninvested cash.

**B.    As Money Market Yields Begin To Increase Significantly Defendants Look To Cash In On Clients' Uninvested Cash**

27.    Beginning in 1977, Merrill Lynch pioneered the concept of a Cash Management Account ("CMA") – an account that combined the features of a typical brokerage account with "sweeps" of uninvested monies into money market funds and the ability to write checks from those funds along with other bank-like features.  This concept was widely adopted by the brokerage industry, and TD Ameritrade's predecessors – TD Waterhouse and Ameritrade – have long offered brokerage accounts which included cash sweep features.

28.    Initially, uninvested monies in these accounts were swept into money market funds so customers would receive the benefit of money market rates while also maintaining the cash proceeds in safe and highly liquid investments.  However, the profits obtained from money market "sweep account" features by the Defendants were limited in nature.  Money market funds typically charge an annual "expense ratio" that is generally small – less than 1% of principal. For example, the expense ratio of Vanguard's Prime Money Market Fund was 0.29% as of June 2006, and the expense ratios for Schwab's money market sweep funds (available only to high

net-worth customers) are currently 0.75% or lower. Also, since money market funds are maintained in a trust, monies in those accounts are *unavailable* for use by a brokerage firm to lend or to invest in higher-yielding activities in order to generate a substantial profit on the spread.

29.    Once sweep accounts were established, it became irresistible to the Defendants to arrange to pay *substantially lower* rates using bank account sweeps or equivalent sweep arrangements, and to *restrict* access to alternative money market sweep accounts. In this way, Defendants could pocket the spread between the low rates paid on bank sweep monies and the substantially higher returns or rates that could be generated by the deployment of bank sweeps.

30.    According to a May 2, 2002 *American Banker* article, beginning in or about 2002, TD Waterhouse started a program to move its customers' sweeps monies from money market funds to bank deposit accounts, where its customers were paid paltry interest rates. And, as stated in an August 1, 2005 *Los Angeles Times* article:

> Money funds have an obligation to get the best possible return for investors, something that is not the case with bank accounts. And unlike money funds, many bank sweeps have several tiers in which smaller accounts earn lower rates. *For example, a TD Waterhouse investor with $25,000 earns 1.36%, but someone with less than $5,000 takes home a rate of 0.25%.*

> The net result is that, by forcing money into a bank sweep account, a brokerage can earn 2 to 4 percentage points on the cash, according to IMoneyNet. By contrast, a brokerage offering a money market fund that is managed in-house would earn about 0.4% on the assets, if it charged the average management fee.

(Emphasis added). By 2006, as the sole alternative to the default sweep into bank accounts, TD Waterhouse offered a "TD Waterhouse Cash" option, which a the time paid the same interest rates as the bank sweeps.

31.    Immediately prior to the January 24, 2006 acquisition of TD Waterhouse by Ameritrade Holding, Ameritrade offered its clients three taxable fund choices and thirteen tax-

13

exempt money market funds that they could have their uninvested cash swept into. Ameritrade's money market funds offered competitive seven-day yields ranging between 1.9% and 3.57% (as of March 14, 2006).

32. However, as part of the TD Acquisition, TD Holding agreed to provide bank sweeps to its subsidiaries' retail brokerage clients (including the legacy Ameritrade clients) through TD Bank. As described in the December 2, 2005 Proxy Statements sent to Ameritrade Holding's shareholders seeking approval of the TD Waterhouse Transactions:

> Concurrently with entering into the share purchase agreement, Ameritrade, *TD and certain subsidiaries of TDWaterhouse agreed to enter into a money market deposit account agreement, or the MMDA agreement, pursuant to which money market deposit accounts will be made available as designated sweep vehicles to clients of TDAmeritrade through TDWaterhouse Bank*. One of the subsidiaries of TD Waterhouse will provide marketing and support services with respect to the money market deposit accounts. In exchange for providing marketing services relating to the money market deposit accounts, *TD Waterhouse Bank will pay TDAmeritrade a marketing fee calculated in accordance with the terms of the MMDA agreement. Subject to limited exceptions, the MMDA agreement has an initial term of two years and is automatically renewable for successive two year terms, provided that following the first anniversary of the agreement, the agreement may be terminated by any party upon one year's notice....*

33. Therefore, as a *quid pro quo* for the TD Waterhouse Transaction, Ameritrade and its parent corporation (now TD Holding) agreed that its retail brokerage customers' cash would no longer as a default be swept into money market funds, but instead would be swept into a lower-interest paying bank account at TD Bank, from which TD Bank and Toronto-Dominion could use that money to generate substantial profits. In order to split the spoils derived from hurting the financial interests of their own brokerage customers, the parties also agreed that TD Ameritrade would derive substantial fees from TD Bank. According to TD Holding's 2006 Form 10-K, TD Ameritrade moved "$6 billion in legacy Ameritrade client credit balances to our MMDA sweep product in late September 2006."

34.    As reported in an article by *TheStreet.com* on February 16, 2007, TD Ameritrade's clients held "a whopping $5.7 billion a day in cash in the last fiscal year" which earned Ameritrade "$185 million in fees from a partner that reinvested the cash at higher rates. (The partner is TB Bank USA, a subsidiary of Toronto-Dominion Bank (TD:NYSE) ...)." The article reported that the "$185 million accounted for 10% of Ameritrade revenue for the 2006 fiscal year" and approximately "21% of the company's $526.7 million in net income for 2006, if you adjust the $185 million down by the company's 38.5% tax rate." In fact, TD Ameritrade told analysts that it expected to earn even more from its sweep program and projected approximately "*$515 million or more*" in profit during fiscal 2007.    (Emphasis added). Moreover, Toronto-Dominion and its affiliate, TD Bank, benefited substantially from TD Ameritrade's utilization of bank sweeps. TD Bank received low-cost funds, which, even after the payment of the fee to TD Ameritrade, allowed it to profit substantially by lending out or re-investing the monies at much higher interest rates.

**C.    TD Ameritrade Sham "Money Market Accounts" Divert Billions Of
Dollars Of Clients' Cash and Drive Exponential 2007 Revenue Growth**

35.    Defendants' deceptive cash sweep programs resulted in an enormous shift of client cash into TD Bank. As reported in TD Holdings' Form 10-K for the year-ended September 29, 2006, TD Holdings' and its affiliates' MMDA revenue spiked to $140 million for fiscal year 2006, as compared to $25 million in the prior fiscal year. Moreover, as specified in the same Form 10-K, as a result of the acquisition of Ameritrade during fiscal 2006, the post-acquisition entity estimated on sweeping an additional $6 billion of customer funds into the MMDA program in 2007, resulting in estimated 2007 MMDA revenues of between $515.6 and $537.8 million – a more than 2000% increase in MMDA revenues within in only two years, as follows:

15

The movement of over $6 billion in legacy Ameritrade client credit balances to our MMDA sweep product in late September 2006 will result in a shift in revenues from net interest revenue to money market deposit account fees in fiscal 2007.

\*    \*    \*

*We expect money market deposit account fees to increase to between $515.6 million and $537.8 million for fiscal 2007, reflecting a full year of legacy TD Waterhouse MMDA balances and the transfer of over $6 billion of legacy Ameritrade client credit balances to the product in late September 2006.*

(Emphasis added).

**D.    Sham "Money Market" Account Allowed Defendants To Build An Undisclosed Multi-Billion Dollar "Cost Free" Bank With Captive Depositors**

36.    Defendants' ability to generate massive profits arose both from the ability to lend and invest client cash at rates of 10% or higher and from the fact that they were essentially able to create a multi-billion dollar bank – filled with captive brokerage client depositors – *without* any of the costs normally associated with commercial banking. The "efficiency ratio" is a banking industry metric that assesses the financial performance of a particular financial intermediary. This ratio is generally defined as the ratio of noninterest expense to revenue, net of interest expense, plus recurring noninterest income. Efficiency ratios of well performing institutions are generally in the 60% range. All things being equal, a lower efficiency ratio indicates more favorable performance by the financial institution. Based on an analysis of Defendants' Form 10-K filings for the year-ended September 29, 2006, Call Reports filed quarterly with the FDIC, Thrift Financial Reports filed quarterly with the Office of Thrift Supervision and Company press releases, it is not surprising that the efficiency ratio of TD Bank, since the acquisition and creation of TD Ameritrade, has been decreasing dramatically, indicating an exponential rate of increasing efficiency for the company. For example, based on the TD Holding's December 2006 press release on Fourth Quarter 2006 and Fiscal 2006

earnings, TD Bank's fiscal 2005 efficiency ratio of 73.8% improved to 59.5% for fiscal 2006 – a change which was the sole result of a spike in MMDA revenues during the 2006 fiscal year. (See ¶35, *infra*).

E.    **TD Ameritrade's Deceptive Cash Sweep and Sham Money**
      **Market Accounts Violated NYSE and NASD Rules**

        37.    Defendants' false and misleading disclosures set forth at ¶¶ 47-65, *infra*, violated fundamental NYSE rules governing brokerage firms' conduct and disclosures.  NYSE Rule 401(a), Business Conduct, states: "every member, allied member and member organization shall at all times adhere to *the principles of good business practice in the conduct of his or its business affairs*."  (Emphasis added).  Likewise, NASD Rule 2110, Standard of Commercial Honor and Principles of Trade, requires that "A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade."  NYSE Rule 405, "Diligence as to Account" (commonly referred to as the "Know Thy Customer" Rule), requires that "every member organization is required … to (1) *Use due diligence to learn the essential facts relative to every customer*, every order, every cash or margin account …."  (Emphasis added).  In addition, NYSE Rule 342.17, "Review of communications with the public," states: "Members and member organizations must develop written policies and procedures that are appropriate for their business, their size, structure and customers in connection with the review of communications with the public relating to their business."  Further, NYSE Rule 472, Communications With The Public, sub-section (i) "General Standards for All Communications," states, in pertinent part: *"No member organization shall utilize any communication which contains (i) any untrue statement or omission of a material fact or is otherwise false or misleading,  …"* and sub-section (j), "Specific Standards for

Recommendations," states in part that "[a] recommendation (even though not labeled as a recommendation) must have a basis which can be substantiated as reasonable." Similarly, NASD Rule 2210(d)(1)(A), "Communications with the Public," states: "communications with the public shall be based on principles of fair dealing and good faith ... and must provide a sound basis for evaluating the facts ...." And, pursuant to NYSE Rule 476 (Disciplinary Proceedings), "conduct or proceeding inconsistent with just and equitable principles of trade" is sanctionable by "fine, censure, suspension or bar from being associated with any member or member organization, or any other fitting sanction."

### F.   Defendants' Cash Sweep Program Blatantly Violated NASD Requirement That Proposed Transactions Be "Suitable"

38.   Defendants' cash sweep program also violated the most basic NASD requirement that the financial transactions proposed by TD Ameritrade to their clients be "*suitable*" meaning that they met the "*customers' financial objectives.*" (Emphasis added.) The cash sweep program, by diverting client cash from high yielding, safe and liquid money market funds into low interest-bearing bank accounts, were clearly "unsuitable" transactions which served to meet only *defendants' financial objectives* at their clients' expense. (Emphasis added.)

39.   The NASD has also promulgated "suitability" rules governing a broker's relationship with its customers. NASD Rule 2310 provides, *inter alia*, as follows:

### 2310. Recommendations to Customers (Suitability)

(a)   In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

(b)   Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make reasonable efforts to obtain

information concerning:

  (1) the customer's financial status;

  (2) the customer's tax status;

  (3) *the customer's investment objectives; and*

  (4) *such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.*

(Emphasis added).

  40. Defendants' cash sweep program also violated NASD Interpretative Materials for Rule 2310, which mandate "fair dealing" with the public, including the requirement to not issue fraudulent misrepresentations and omissions in connection with financial transactions:

**IM-2310-2. Fair Dealing with Customers**

(a)(1) *implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing.* Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with *particular emphasis on the requirement to deal fairly with the public.*

(2) this does not mean that legitimate sales efforts in the securities business are to be discouraged by requirements which do not take into account the variety of circumstances which can enter into the member-customer relationship. *It does mean, however, that sales efforts must be judged on the basis of whether they can be reasonably said to represent fair treatment for the persons to whom the sales efforts are directed*, rather than on the argument that they result in profits to customers.

(b) District Business Conduct Committees and the Board of Governors have interpreted the Rules, taken disciplinary action and imposed penalties in many situations where members' sales efforts have exceeded the reasonable grounds of fair dealing. *Some practices that have resulted in disciplinary action and that clearly violate this responsibility for fair dealing are set forth below, as a guide to members*:

*  *  *

### (4) Fraudulent Activity

(A)    Numerous instances of fraudulent conduct have been acted upon by the Association and have resulted in penalties against members. Among some of these activities are:

\*    \*    \*

ii)    **Discretionary Accounts**

*Transactions in discretionary accounts in excess of or without actual authority from customers.*

(iii)    **Unauthorized Transactions**

Causing the execution of transactions which are unauthorized by customers *or the sending of confirmations in order to cause customers to accept transactions not actually agreed upon.*

(iv)    **Misuse of Customers' Funds or Securities**

*Unauthorized use or borrowing of customers' funds or securities.*

(B)    *In addition, other fraudulent activities, such as forgery, non-disclosure or misstatement of material facts, manipulations and various deceptions,* have been found in violation of Association Rules. These same activities are also subject to the civil and criminal laws and sanctions of federal and state governments.

(Emphasis added).

**G.    Defendants Disregard NYSE Guidelines For Sweep Disclosures**

41.    On February 15, 2005, the NYSE issued Information Memo (Number 05-11) stating concerns about brokerage firms' adaptation of sweep accounts, noting that, "[i]n some cases, however, cash sweep account programs at member organizations may have been instituted or changed without fully appropriate levels of disclosure and customer consent." As stated in the August 1, 2005 *Los Angeles Times*:

The move to bank deposits has caught the attention of regulators at the New York Stock Exchange, *who are worried that brokerages may not be properly disclosing the account shifts to customers and may in some cases be stuffing them into unfairly low-yielding accounts.* In a warning to firms in February, the NYSE told them to mail clearly worded disclosures to customers about bank-sweep programs.

*"In some instances, you've got to read through 40 pages of paper, and the print can be very small,"* said Grace Vogel, NYSE executive vice president of member firm regulation.

(Emphasis added).

42.    The Information Memo first noted that where a client's funds are moving from a higher yielding money market to a lower yielding bank account, it may well be inappropriate for the firm to merely rely upon disclosure as opposed to obtaining the client's specific consent:

### DISADVANTAGEOUS CHANGES IN THE RATE STRUCTURE

The Exchange will review each new program and/or change to an existing program individually, and would expect that any customer agreement being used as a basis for prior or negative consent provides the customer with notice of the process by which the agreement could be amended, together with effective contemporary or subsequent disclosure, in order to justify such consent(s). *Where the interest rate to be paid by the bank is materially less than the rate currently paid by the customer's prior money market mutual fund account; where the bank rate is a temporary promotional rate; or where the member organization's business model or known plans propose lowering the rate, whether in real terms or as against market rates, prior or negative consent may not be adequate.*

(Emphasis added).

43.    The NYSE Information Memo also indicated that the sweep disclosure needed to be done at a number of different times: when the change was made; when new accounts were opened; and when changes were made to the sweep program after the program was implemented:

### CUSTOMER DISCLOSURES

As discussed more fully below, member organizations must disclose the terms and conditions, risks and features of their programs, conflicts of interest, current interest rates, the manner by which future interest rates will be determined, as

well as the nature and extent of SIPC or FDIC insurance available. In addition, customers should be advised of which entity to contact should they wish to gain access to their funds. *All such disclosures should be forthright, clear, complete, prominent and unambiguous.* Given the complicated nature of these disclosures, these points should also be summarized in a concise document, preferably on one or two pages, written in plain English and referring customers to places where additional and more detailed disclosure is available. These disclosures should be made: (1) at the time when such programs are first implemented by the member organization, (2) at the opening of new accounts, and (3) as changes are made to an existing program.

(Emphasis added.)

44.    Finally, the NYSE also indicated the nature of the specific disclosure which should be made, including the "expected range" of the firm's profit or "compensation and other benefits for customer balances maintained at the bank;" that bank rates may be "inconsistent with" the clients' "reasonable expectation of money market rates;" and that banks as opposed to money market funds are not obligated to provide the highest yields:

### CONFLICTS OF INTEREST

Rule 472(i) ("General Standards For All Communications") provides, in pertinent part: "No member or member organization shall utilize any communication which contains (i) any untrue statement or omission of a material fact or is otherwise false or misleading". Member organizations therefore must include in their agreements or disclosure documents any conflicts of interest in connection with the cash sweep program, including *whether the member organization receives compensation or other benefits for customer balances maintained at the bank, and if so the expected range of such compensation, as well as a disclosure of the difference, if any, between the rates of return at the existing money market fund and the proposed bank sweep fund. A change from a money market mutual fund to a bank sweep fund may be inconsistent with the customer's reasonable expectations with regard to money market rates.* While a registered investment company, such as a money market mutual fund, is bound by fiduciary obligations to its shareholders (customers of the member organization) to seek the highest rates prudently available (less disclosed fees and expenses), *when customer funds are swept to an affiliated bank it is in the interest of the member organization and its affiliates to pay as low a rate as possible,* consistent with their views of competitive necessities. There may be no necessary linkage with rates prevailing in the market, and these funds are not being managed, in this instance, under the same fiduciary obligations.

22

(Emphasis added).

45.    The NYSE's Information Memo was followed in April 2005 by a speech given by Richard Ketchum, then the head of the NYSE's regulatory unit, which even more clearly set forth the kind of specific disclosures needed to apprise clients of the adverse impact on the clients and enormous gain for the Defendant firms that the sweep program posed:

> An equally important part of your firm's control program must be to proactively consider the effectiveness of your investor disclosures as you make changes that directly impact your customers.
>
> Two examples can illustrate this point. *First, many larger firms have attempted to capitalize on the firm's affiliation with a banking operation to begin sweeping customers' free credit balances to that bank as opposed to money market funds. Done correctly, this may make sense for all parties, but the conflicts are clear. We have recently put out a notice to our member firms to emphasize the importance of clear and direct disclosure here. Does the customer understand the alternatives they have within and outside the firm? Are relevant money market rates rules made easily accessible and explained? Are payments made by the affiliated firm to the brokerage effectively disclosed? Finally, are the rates comparable to money market alternatives? If not we have serious concerns with the movement of customers' funds without their affirmative consent.*
>
> This is an area where we have tried to put out our views to the industry, after consultation and without new rules or enforcement actions. But this direction will only continue if the industry response is commensurate.

(Emphasis added).

46.    Needless to say, Defendants' disclosures failed to comply either with the Information Memorandum or Ketchum's speech on the same subject. As is demonstrated below, the disclosures were buried and in piles of paper and achieved their purpose of obfuscating Defendants' massive profits at their clients' expense.

VI.

**MATERIAL MISREPRESENTATIONS AND OMISSIONS**

**A.    TD Ameritrade Defendants Falsely and Deceptively Tout Its
"Personal Service" And "Support" To Help Achieve *Clients'* Goals**

47.    TD Ameritrade touted its "outstanding service" and commitment to "empowering" clients so they achieve their financial goals, including with statements on its web site as follows:

> **Why Choose TD AMERITRADE?**
> When investing with TD AMERITRADE you'll find state-of-the-art tools, *outstanding personal service*, affordable pricing and innovative technology. As an independent investor, you know where you want to go. *We're committed to helping you get there by empowering your path to pursue your goals.*
>
> **Fostering your independent
> spirit**
> Need a little support? Looking for a lot? *Whatever level of support and education you need to help pursue your financial goals, you'll find it at TD AMERITRADE.* We deliver an extensive array of education and services to empower your trading or investing plan.
> *    *    *
> **Flexible support, outstanding
> service**
> *No matter where you are or what level of support you need, we're here. Online 24 hours a day, seven days a week.* Over the phone for your convenience. Or one-on-one, for personal service at one of our nationwide TD AMERITRADE branches.
>
> *    *    *
>
> **Nationwide branch network**
> Get individualized assistance and personal guidance by visiting one of our nationwide branches. *You'll discover the tools and services to help you reach your goals.*

(Emphasis added).

**B.    TD Ameritrade Defendants Falsely and Deceptively Claim It Provides
"Unbiased Market Information" For "Informed Trading Decisions"**

**Independent, objective**

24

**research to count on**

We can help you make more informed investing decisions with powerful, independent market research from third-party industry leaders. **And because we don't sell investment products that carry our name, you can count on** *unbiased market information* **to power up your investing strategy.**

**Investing for your long-term Plan**

Find a wide range of practical solutions, *impartial guidance and service* to help you create a path to your long-term goals…all at a great value.

**Powerful trading and market tools**

Spot and seize potential market opportunities with our powerful online trading tools. Monitor the markets and manage data easily to put your trading strategy into action. We make it convenient with our state-of-the-art trading and market tools. **Get the real-time market information you want to help you make more informed trading decisions.**

**Straightforward, affordable pricing**

You won't be charged any maintenance fees and you'll get low, flat-rate $9.99 commissions on Internet equity trades no matter how many shares you buy. That's our straightforward pricing. Clear and simple.

(Emphasis added).

48.     TD Ameritrade's statements about, *inter alia,* providing outstanding support, practical solutions and impartial guidance were repeated hundreds of time in print, television and other media.  In particular, TD Ameritrade has sought to cement its false image as a truthful and non-deceptive firm by relying almost exclusively in its recent television and print advertisements on an actor, Sam Waterston, who has become immediately identified as the highly ethical government prosecutor role in the "Law & Order" television series.

49.     The statements in the preceding paragraphs were materially false and misleading since, *inter alia,* rather than providing outstanding "support" and "personal service," necessary "[to] pursue [clients'] financial goals," and that its provides "unbiased" information to allow its clients to make "more informed decisions" were all blatantly false since, in fact, TD Ameritrade

touted as "great options" its Cash Balances Programs which are among the worst possible cash

investments serving only TD Ameritrade at its clients' expense.

**C.     TD Ameritrade Defendants Falsely and Deceptively Claim
        "Money Market" Accounts Are A "Great Option"**

50.     TD Ameritrade also touted its "great options" provided to its clients for earning

interest on cash balances as follows:

> **Earn interest on cash balances**
> You can choose how you'd like to earn interest on your cash balance when it is
> not invested in securities with *two great options*: TD Bank USA, N.A. Money
> Market Deposit Account or TD AMERITRADE Cash. Read a summary of the
> cash balance programs or check out the rates.

(Emphasis added.)

51.     The statements set forth in the preceding paragraph were materially false and

misleading since, *inter alia*, rather than providing "two great options" to earn interest on cash

balances," Defendants ensured that client cash was swept into banks accounts paying low rates

of interest where Defendants could use the cash for their own profit and benefit and to the

Class's detriment.  In addition, these statements failed to mention that the deceptively titled

Money Market Deposit Account ("MMDA") was not a money market fund – like the sixteen

money market funds that Ameritrade previously offered – but rather merely stated that the

Money Market Deposit Account was an account through its affiliated bank.

**D.     TD Ameritrade Defendant Falsely and Deceptively Describe Sweep
        Accounts As "Money Market Account" or "MMDA"**

52.     In "Earn Interest on Cash Balances" disclosure above was linked to a "Summary

of Cash Balance Programs" web page that purports to disclose to clients the cash sweep program.

The "Summary of Cash Balances Programs" states, *inter alia*, as follows:

> **Cash Sweep Options.** *Money Market Deposit Account ("MMDA")* – The TD
> Bank USA, N.A. MMDA serves as the primary sweep vehicle for earning income

on cash balances in TD AMERITRADE brokerage accounts and is the default cash sweep vehicle unless you make an alternative sweep election. Excess cash is swept to the TD Bank USA, N.A. and it is FDIC insured (see "FDIC Limits of Coverage" below). TD AMERITRADE Cash – Cash balances are held in your broker account, earn simple interest and are insured by the SIPC.

53.     However, this "Summary" failed to mention that the deceptively titled Money Market Deposit Account ("MMDA") was not a *bona fide* money market fund – like the sixteen money market funds that Ameritrade previously offered – but merely a bank savings account.

54.     The "Summary" also stated that interest rates paid on balances in the MMDA and TD Ameritrade Cash were based on tiers – with the smallest accounts earning little or no interest on their uninvested cash.

Interest Rates. Interest rates paid on balances in the MMDA and TD Ameritrade Cash are based on tiers. The previous day's closing balance determines eligibility for a particular tier each day. Current interest rates for the MMDA and TD Ameritrade Cash are as follows:

| MMDA Tiered Rates as of August 1, 2006 | | TD Ameritrade Cash Rates as of August 1, 2006 | |
|---|---|---|---|
| Dollar Range | Interest Rate | Dollar Range | Interest Rate |
| $.01 to $4,999 | 0.10% | $.01 to $1,999 | 0.00% |
| $5,000 to $24,999 | 0.40% | $2,000 to $9,999 | 0.10% |
| $25,000 to 99,999 | 1.65% | $10,000 to $24,999 | 0.40% |
| $100,000 to $199,999 | 2.40% | $25,000 to $99,999 | 1.05% |
| $200,000 and above | 2.90% | $100,000 and above | 2.15% |

55.     The statements set forth in paragraphs 52 and 54 were materially false and misleading for the reason set forth in paragraph 53 and since they failed to disclose that clients were receiving the lowest rates on the smallest accounts and, furthermore, the fact that money market funds would have yielded a much higher rate.

56.     As a result of the materially false and misleading statements and failures to disclose set forth in paragraphs 47, 48, 50, 52 and 54, *supra*), Plaintiffs and other Class members opened and maintained brokerage accounts with Defendants, believing that they were receiving competitive interest rates on their cash balances.

E.    **TD Ameritrade Defendants Falsely and Deceptively Purport
      To Offer "Alternatives" To "Money Market" When In Fact
      No Meaningful Alternatives Exist**

57.    The "Summary of Cash Balance Programs" includes the following statement about alternatives to the bank sweep program:

> Additional cash sweep options may be available based on cash balance amount and account type.

58.    The statement in the preceding paragraph was materially false and misleading since, *inter alia*, there were no viable "alternative cash investments" offered to Plaintiff except to receive *less* interest through the TD Ameritrade Cash sweep option.    Thus, in truth, TD Ameritrade clients had two bad investment alternatives, both of which served only TD Ameritrade at its clients' expense:    either funds were automatically swept into the TD Bank paying a depressed savings account rate of interest; or funds stayed in the brokerage entity and earned *even less* interest.

F.    **TD Ameritrade Defendants Falsely and Deceptively Understated
      Its Enormous Profits From "Money Market" Accounts**

59.    The "Summary of Cash Balance Programs" makes the following statements about the "benefits" to TD Ameritrade from the bank sweep program:

> **Benefits to TD Ameritrade and TD Bank USA, N.A.** TD Bank USA, N.A. used MMDA balances to fund current and new investment and lending activity. *The Bank seeks to make a profit by achieving a positive spread between its cost of funds (e.g. deposits) and the return on its assets, net of expenses.*
>
> *TD Ameritrade receives a fee from the Bank for marketing and related services in connection with the MMDA.* TD Ameritrade has the right to waive all or part of this fee. The fee is derived using a formula which results in the fee varying from month to month depending on the interest rate environment and the profitability of the Bank with respect to such deposits. As required by Federal Regulations, the fee the Bank pays TD Ameritrade does not exceed the amount that the Bank would offer in good faith to non-affiliated entities. The rate of the fee that TD Ameritrade receives may exceed the interest rate or effective yield that you receive in your MMDA. *Other than the applicable fees we charge on*

*brokerage accounts, there will be no charges, fees or commissions imposed on your account for this cash sweep feature.*

(Emphasis added.)

60.     The statements in the preceding paragraph were materially false and misleading since, *inter alia*, investors could never glean from these disclosures the true windfall profits being made by TD Ameritrade, including that cash sweeps accounted for 21% of TD Ameritrade's 2006 net income.

**G.     TD Ameritrade Defendants Falsely and Deceptive Identified Savings Accounts As "Money Market Accounts" In Its Money Account Statements to Clients**

61.     In monthly account statements rendered to Plaintiff and the Class, TD Ameritrade falsely and deceptively identified sweep monies maintained at TD Bank as being in a "Money Market Account":

> TD Bank USA NA
> *Money Market Account*
> FDIC Insured Not Covered by SIPC

(Emphasis added).

62.     The statements set forth in the preceding paragraph were materially false and misleading since, *inter alia*, those sweep monies were not maintained in a money market fund – like the sixteen money market funds that Ameritrade previously offered – but in an account paying interest rates substantially below those offered in money market funds, including those offered by TD Ameritrade.

**H.     Defendants' Fraudulent Concealment**

63.     Throughout the Class Period, Defendants wrongfully and actively concealed from Plaintiff and other Class members the true nature of their cash sweeping practices and tiered tactics regarding their customers' uninvested cash balances.   Defendants' continuous

representations – to Plaintiff and other Class members in monthly account statements, and other reports throughout the Class Period – precluded Plaintiff and other Class members from discovering the nature of the fraud. These representations were reasonably relied upon by Plaintiff and the other Class members.

64.    During the Class Period, Defendants materially misled Plaintiff and the Class by issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. These statements and omissions failed to disclose material adverse information and misrepresented the truth about Defendants' tiering cash sweeping practices, as alleged herein, including that Defendants were reaping enormous financial profits at the customers' expense.

65.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other Class members. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Defendants' brokerage accounts. These material misstatements and omissions had the cause and effect of inducing investors into letting their uninvested cash balances to be put into sweep bank deposits on the belief that Defendants were giving Plaintiff and other Class member "two great options" for their uninvested cash via the sweep program, when, in fact, Defendants were making enormous profits at their expense.

**FIRST CLAIM**

**Violation of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq.**

66.　　Plaintiff repeats and realleges the allegations as set forth above as if set forth fully herein.

67.　　TD Ameritrade is an investment adviser under the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*, who entered into express, implied or assumed cash sweep contracts with Plaintiff and other members of the Class. TD Ameritrade, for compensation, engages in the business of advising Plaintiff and other members of the Class, either directly or through publications or writings, as to the value of "securities" or as to the advisability of investing in, purchasing, or selling "securities" as defined at 15 U.S.C. § 80b-2(11).

68.　　The provision of bank sweep account services is not incidental to the conduct of their business and TD Ameritrade receives special compensation therefore. This compensation includes but is not limited to the percentage fees paid to TD Ameritrade by its affiliated sweep bank – Defendant TD Bank – for the providing TD Bank with customer cash sweeps.

69.　　Under the Investment Advisers Act, TD Ameritrade, as an Investment Adviser, owed to Plaintiff and other members of the Class a fiduciary duty to fully and fairly disclose to all conflicts of interest and all material facts, and an affirmative obligation to employ reasonable care to avoid misleading clients.

70.　　In breach of its fiduciary duties to Plaintiff and other members of the Class in violation of the Investment Adviser Act, TD Ameritrade made the above-described misrepresentations, concealment and omissions of material facts concerning its cash sweeping practices and its tiered tactics, thereby deceiving Plaintiff and other members of the Class with

31

full knowledge that they were false and misleading and that the customers' cash balances were being reinvested for its own profit at the customers' expense.

71.    As a result of Defendants' fiduciary duty breaches, TD Ameritrade's bank sweep account agreements with Plaintiff and other members of the Class are void under Section 15 of the Investment Advisers Act, 15 U.S.C. § 80b-15(b), which provides:

> Every contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

72.    Defendants Toronto-Dominion, TD Holding and TD Bank acquired rights under and was benefited by TD Ameritrade's bank account sweep agreements and had actual knowledge of the conduct engaged in by the TD Ameritrade that made those agreements in violation of the Investment Advisers Act.

73.    In addition to seeking a declaratory judgment that the sweep account agreements with the Class are void, Plaintiff seeks an accounting and restitution on behalf of the Class of all monies and fees wrongfully obtained by Defendants pursuant to the bank sweep account program, and disgorgement of all profits made by the Defendants due to their conduct in violation of the Investment Advisers Act.

## SECOND CLAIM

### Violation of the New York General Business Law § 349

74.    Plaintiff repeats and realleges the allegations as set forth above as if set forth fully herein.

75.    Section 349 of the New York's General Business Law states:

Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

76.    As set forth above, Defendants engaged in a plan and scheme to mislead and deceive Plaintiff and members of the Class. Defendants' deceptive acts, practices, and the false representations and omissions made by Defendants to Plaintiff and the other Class members concerning their brokerage accounts and cash balances were prepared and disseminated from New York in the course of conducting their business, trade and services in New York, including but not limited to all of the statements made in the "Summary of Cash Balance Programs" disclosure statement, monthly brokerage statements and other public statements. Defendants' statements, omissions and deceptive scheme, directed at consumers, misled and deceived Plaintiff and the other Class members. Defendants' misrepresentations and omissions were likely to mislead reasonable consumers acting reasonably under the circumstances.

77.    Defendants' conduct and actions, as described above, constitute deceptive business practices in violation of the GBL.

78.    The damages sustained by Plaintiff and the other Class members were a direct and foreseeable result of, and were proximately caused by Defendants' deceptive business practices.

79.    As a result of Defendants' actions, Plaintiff and other Class members have been injured and damaged in an amount to be determined at trial.

## THIRD CLAIM

### Common Law Fraud

80.    Plaintiff repeats and realleges the allegations as set forth above as if set forth fully herein.

81. The above described conduct and actions constitute common law fraud by way of misrepresentations, concealment and omissions of material facts made by Defendants. As set forth above, Defendants engaged in a plan and scheme to mislead and deceive Plaintiff and members of the Class.

82. Defendants made the above-described misrepresentations, concealment and omissions of material facts which they had the duty to disclose concerning, *inter alia*, their sham and falsely denominated "money market" account, their two "great options" for sweeping uninvested cash and their tiered tactics, with full knowledge and/or reckless disregard that they were false and misleading and that the customers' cash balances were being reinvested for their profits at the customers' expense.

83. Defendants intended that the Plaintiff and the other Class members relied upon the above-described misrepresentations, concealment and omissions.

84. Defendants' misrepresentations and omissions concerning, *inter alia*, their sham and falsely denominated "money market" account, their two "great options" for sweeping uninvested cash and their tiered tactics, were material in Plaintiff's and the other Class members' decision to open and maintain a brokerage account with Defendants, and to maintain monies in bank sweep accounts.

85. Plaintiff and other Class members justifiably relied upon such misrepresentations, concealment and omissions to their damage and detriment.

86. The damages sustained by Plaintiff and the other Class members were a direct and foreseeable result of, and were proximately caused by, Defendants' misrepresentations, concealment and omissions.

87.    As a result of Defendants' actions, Plaintiff and the other Class members have been damaged and injured in an amount to be determined at trial.

88.    Defendants' conduct was willful, wanton, and reckless.    Based on the intentionally dishonest nature of Defendants' conduct, which was directed at the Class and at the public generally, Defendants should also be held liable to the Class for punitive damages in an amount to be determined at trial.

## FOURTH CLAIM

### Breach of Fiduciary Duty

89.    Plaintiff repeats and realleges the allegations as set forth above as if set forth fully herein.

90.    As set forth above, Defendants engaged in a plan and scheme to breach fiduciary duties owed to Plaintiff and members of the Class.    The Defendants, through their creation, implementation and operation of TD Ameritrade's Cash Sweep Program, maintained, and continue to maintain discretionary authority over the available investment vehicles for Plaintiff and other Class Members' uninvested cash, and as such owed fiduciary duties to Plaintiff and the other Class members.    Defendants participated in a false and deceptive scheme which violated their fiduciary duties of loyalty and fair dealing owed to Plaintiff and the Class by causing Plaintiff and Class members' uninvested cash to be placed in low interest bearing bank accounts at TD Bank, deceptively titled "money market accounts," and even though such investments were wholly unsuitable under the NASD rules and failed to represent best execution under the rules, and were done solely in order to enhance their own profits at the Plaintiff and the Class' expense.    Defendants also violated their fiduciary duties of full and complete disclosure in that

35

the investment was unsuitable for Plaintiff and the Class and due to all conflicts of interest regarding their implementation and administration of the cash sweep transactions.

91.     As fiduciaries, Defendants, their agents and representatives, owed to Plaintiff and other Class members the duties of good faith, fair dealing, due care and loyalty in connection with their management and use of Plaintiff's and the Class' funds, and also the duty to disclose all material facts which might reasonably affect Plaintiff's and the Class' investment decisions, including any interest or benefit Defendants received in a transaction where they are serving their clients.

92.     In breach of their fiduciary duties to Plaintiff and other Class members, Defendants made the above-described misrepresentations, concealment and omissions of material facts concerning, *inter alia*, their sham "money market account" sweep option to customers, their two "great options" for sweeping uninvested cash and their tiered tactics, with full knowledge that those statements were materially false and misleading and that the customers' cash balances were being reinvested for their profits at the customers' expense, all in violation of NASD and NYSE rules.

93.     In breach of their fiduciary duties to Plaintiff and other Class members, Defendants transferred their clients' uninvested funds into bank deposits for Defendants' own use and benefit and unilaterally used the "negative consent" to modify the terms of the Cash Sweep Program to promote their own advantage, to the detriment, rather than for the benefit, of Plaintiff and other Class members. Defendants Toronto-Dominion and TD Bank permitted and participated in such diversion of funds from TD Ameritrade's clients.

94.     In breach of their fiduciary duties to Plaintiff and the other Class members, Defendants in the MMDA Agreement bargained away the interests of their own brokerage

customers in order to reap for themselves the spread between interest rates to be paid to customers on bank sweeps through TD Bank, and the profits that could be obtained by re-lending or re-investing those monies at substantially higher interest rates.

95.    Alternatively, TD Ameritrade, in placing Plaintiff's and the Class' money into low-interest paying sweep accounts, deceptively titled "money market accounts," acted as the agents and at the control and direction of TD Holding, TD Bank and Toronto-Dominion. These Defendants are liable therefore. TD Holding, TD Bank and Toronto-Dominion, with full knowledge of TD Ameritrade's scheme, directly benefited from the bank sweep arrangements to Plaintiff's and the Class' detriment.

96.    The damages sustained by Plaintiff and other Class members were a direct and foreseeable result, and were proximately caused by, Defendants' breaches of their fiduciary duties.

97.    As a result of the Defendants' actions, Plaintiff and the other Class members have been damaged and injured, and the Defendants including the brokerage banking and corporate Defendants have been unjustly benefited, in an amount to be determined at trial.

98.    The Defendants' conduct was willful, wanton, and reckless. Based on the intentionally dishonest nature of the Defendants' conduct, which was directed at the Class and at the public generally, the Defendants should also be held liable to the Class for punitive damages, in an amount to be determined at trial.

### FIFTH CLAIM

#### Aiding and Abetting Breach of Fiduciary Duty
#### (against TD Holding, TD Bank USA and Toronto-Dominion)

99.    Plaintiff repeats and realleges the allegations as set forth above as if set forth fully herein.

100.    As set forth above, TD Ameritrade breached its fiduciary duties to Plaintiff and the Class.

101.    Defendants TD Holding, TD Bank and Toronto-Dominion, for their financial benefit, knew of, knowingly induced or participated in, permitted, and provided substantial assistance to, the fiduciary breaches by their affiliate TD Ameritrade by, *inter alia*, orchestrating and directing the bank account sweep set forth above, arranging for TD Bank to be used for bank sweep accounts, and reviewing and approving or ratifying both the bank sweep program adopted by TD Ameritrade and the disclosures made by TD Ameritrade concerning the bank sweep program and brokerage accounts. As set forth above, Defendants engaged in a plan and scheme to mislead and deceive Plaintiff and members of the Class.

102.    The damages sustained by Plaintiff and the Class were a direct and foreseeable result of, and were proximately caused by, Defendants Toronto-Dominion and TD Bank's aiding and abetting conduct.

103.    As a result of Toronto-Dominion and TD Bank's actions, Plaintiff and other Class members have been damaged and injured, and Toronto-Dominion and TD Bank have been unjustly benefited, in an amount to be determined at trial.

104.    Toronto-Dominion and TD Bank's conduct was willful, wanton, and reckless. Based on the intentionally dishonest nature of Toronto-Dominion and TD Bank's conduct, which was directed at the Class and at the public generally, the Toronto-Dominion and TD Bank should also be held liable to the Class for punitive damages in an amount to be determined at trial.



## SIXTH CLAIM

### Negligence
### (against TD Ameritrade)

105.    Plaintiff repeats and realleges the allegations as set forth above as if set forth fully herein.

106.    TD Ameritrade, Inc. owed to Plaintiff and other Class members a duty of care concerning Defendants' deployment of "sweep" monies and concerning the advice and information given by Defendants regarding bank sweep accounts and other alternatives.

107.    TD Ameritrade breached its duty of care, *inter alia*, by placing Plaintiff's and the Class's uninvested monies into bank sweep accounts at substantially below money market rates, by making the misrepresentations and omissions set forth herein, by unilaterally using "negative consent" to modify the terms of Cash Balance Programs to promote their own advantage to the detriment of their clients, and by violating the NYSE and NASD rules and regulations set forth at paragraphs 37, 39 and 40, *supra*, including the NYSE and NASD rules concerning communications, and the NYSE "know thy customer" and NASD "suitability" rules.

108.    TD Ameritrade's conduct as described herein was, at minimum, negligent.

109.    The damages sustained by Plaintiff and the other Class members were a direct and foreseeable result of, and were proximately caused by, Defendants' breaches of their duty and negligent conduct.

110.    As a result of TD Ameritrade's actions, Plaintiff and the other Class members have been damaged and injured, in an amount to be determined at trial.



## SEVENTH CLAIM

### Unjust Enrichment

111.    Plaintiff repeats and realleges the allegations as set forth above as if set forth fully herein.

112.    Plaintiff and the other Class members entered into contracts with TD Ameritrade to open and maintain brokerage accounts.

113.    Throughout the Class Period, the Defendants, by arranging to put the customers' cash into low interest paying deposit accounts at TD Bank, generated higher interest profits for their affiliates.

114.    Defendants have been unjustly enriched at the expense of and to the detriment of Plaintiff and each member of the Class by collecting money to which they are not entitled. Specifically, by reinvesting the customers' cash at higher rates while paying the customers the lowest rates, Defendants used the investors' funds to derive profits for themselves and their affiliates, and thus yielded enormous ill-gotten profits at their clients' expense.

115.    Defendants should be required to disgorge this unjust enrichment.

## EIGHTH CLAIM

### Negligent Misrepresentation

116.    Plaintiff repeats and realleges the allegations as set forth above as if set forth fully herein.

117.    Defendants' above-described misrepresentations, concealment and omissions of material facts concerning, *inter alia*, their sham and falsely denominated "money market" account, their two "great options" for sweeping uninvested cash and their tiered tactics were false and misleading, in violation of their duties to Plaintiff and the Class.



118.    Defendants were negligent in making the above-described misrepresentations, concealment and omissions of material facts.

119.    Defendants' misrepresentations and omissions concerning the brokerage accounts, including the cash sweeping practices, were material in Plaintiff's and the other Class member's decision to open and maintain a brokerage account with Defendants, and to maintain monies in bank sweep accounts.

120.    Plaintiff and other Class members justifiably relied upon such misrepresentations, concealment and omissions to their damage and detriment.

121.    The damages sustained by Plaintiff and the other Class members were a direct and foreseeable result of, and were proximately caused by, Defendants' misrepresentations, concealment and omissions.

122.    As a result of Defendants' actions, Plaintiff and the other Class members have been damaged and injured in an amount to be determined at trial.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory and punitive damages in favor of Plaintiff and the other Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre- and post-judgment interest thereon;

(c)    Requiring Defendants to account for and/or pay in damages to Plaintiff and other Class members the amounts by which Defendants benefited due to Defendants' wrongful conduct;

41

(d)    Requiring Defendants to hold in constructive trust for the benefit the Plaintiff and other Class members the monies obtained through the Defendants' fraudulent, unfair, and unconscionable conduct which caused Defendants to be unjustly enriched at the expense of the Plaintiff and other Class members;

(e)    Entering a Declaratory Judgment that Defendants' bank sweep account agreements with Plaintiff and other Class members are void, and requiring restitution and disgorgement of all monies and profits obtained by Defendants or their affiliates pursuant to or as a result of the those agreements or the cash sweep program;

(f)    Awarding Plaintiff and other Class members their reasonable costs and expenses incurred in this action, including counsel fees and costs, and expert fees and costs; and

(g)    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demand a trial by jury.

Dated: New York, New York
       August 1, 2007

SCHOENGOLD SPORN LAITMAN &
LOMETTI, P.C.
Samuel P. Sporn (SS-4444)
Joel P. Laitman (JL-8177)
Kurt Hunciker (KH-4190)
Frank R. Schirripa (FS-1960)
Daniel B. Rehns (DR-5506)
19 Fulton Street, Suite 406
New York, NY 10038
Tel: (212) 964-0046
Fax: (212) 267-8137

*Counsel for Plaintiff and Proposed Putative Class*

42