# EXHIBIT C
## Part I of II

Client Account Agreement

# TD AMERITRADE, Division of
# TD AMERITRADE, Inc.





# TD AMERITRADE Client Account Agreement

IMPORTANT: PLEASE READ THIS AGREEMENT CAREFULLY BEFORE USING ANY OF THE TD AMERITRADE SERVICES

In consideration of TD AMERITRADE, Inc. ("TD Ameritrade") and National Investor Services Corp. ("NISC") (collectively "you") accepting and carrying for me one or more accounts, I hereby understand and agree that:

1. Definitions:
- "I," "me," "my," or "account owner" means each account owner who signs the account application. "You," "Your," or "TD AMERITRADE" means TD AMERITRADE Inc., its employees, representatives, officers, directors, agents, successors and assigns.
- The terms "securities," "options," or "other property," as used herein, shall include money, securities, and commodities of every kind and nature, and all contracts and options relating thereto.
- "Bank" means TD Bank USA, N.A.
- "CMS" means the TD AMERITRADE cash management services, which consists of my Brokerage Account, and a Designated Sweep Vehicle that may be accessed by Check or ATM/VISA® Check Card.
- "Designated Sweep Vehicle" means the sweep vehicle that I have designated on my account application for holding uninvested cash balances.
- "Brokerage Account" means the securities brokerage account opened in my name at TD AMERITRADE, and includes my Designated Sweep Vehicle.
- "Checks" mean checks which are issued to me, and which are drawn on my Brokerage Account through CMS.
- "Card" means the ATM/VISA Check Card that I may automatically receive to access my Brokerage Account through CMS.
- "Investors Check Advance" means my available margin credit, which can be used as overdraft protection when writing a Check drawn on my Brokerage Account or by use of my Card.
- "Business Day" means Monday through Friday, excluding Bank and New York Stock Exchange holidays.
- "Available Cash Balance" means amounts held in my Designated Sweep Vehicle and any additional amounts held in any other Money Market Fund or Money Market Account included in my Brokerage Account.
- "Available Margin Credit" means the amount of credit TD AMERITRADE may extend to me based on the value of marginable securities held in my margin and short account.
- "FDIC" means Federal Deposit Insurance Corporation.
- "NISC" means National Investor Services Corp., its employees, representatives, officers, directors, agents, successors and assigns.
- "SIPC" means Securities Investor Protection Corporation.

2. Legal Capacity to Enter Into Agreements — I am at least the age of 18 years and am of full legal age in the state in which I reside. If I am an employee, member, or partner of any security exchange, or the National Association of Securities Dealers, Inc., or member firm thereof, of any corporation, a majority of the stock of which is owned by any exchange or a broker/dealer or of any corporation, firm, or individual engaged in the business of dealing either as broker or as principal in securities, bills of exchange, acceptances, or other forms of commercial paper I have so indicated on the account application. I also agree to notify you promptly if I should later become employed in any of the capacities cited above. I further represent that no one else has an interest in any of my Accounts with you.

3. Applicable Rules and Regulations — All transactions shall be subject to the rules, customs and usages of the exchange, market trading system, or clearing house where executed, and to all applicable federal and state laws and regulations.

4. Orders, Executions, and Statements — Reports of the execution of orders and statements of my account shall be deemed accepted by me if you have not received written objections from me within five (5) days with respect to the former, and ten (10) days with respect to the latter after transmitted by you to me. You may execute any transaction authorized by me on any exchange trading system or other market where such business is then transacted. You may reject any order I place with you at your sole discretion. I understand that you reserve the right to refuse, and assume no responsibility for, orders sent through the mail for the purchase or sale of securities or other investments. I also understand that if I request the transfer or registration of foreign securities, I may be responsible for any transfer fees charged to you.

I understand that my account is carried by NISC, which directs client orders in securities to exchanges and market makers based on an analysis of their ability to provide rapid and quality executions. These market participants guarantee that all client orders are executed at a price equal to, or better than, the displayed national best bid/best offer. Your policy also assures that these market participants provide your client orders with limit order protection and opportunities for price improvement. I further understand that you receive remuneration for directing client orders to these market participants, the source and amount of which is available upon written request.

5. Deposit of Equity — I understand that you reserve the right to require full payment, or an acceptable equity deposit, prior to the acceptance of any order.

6. Consent to Recording and Monitoring E-mail — I understand, agree, and expressly consent to permit you to tape record phone conversations and monitor electronic communications with me.

7. **Payment of Indebtedness Upon Demand** — I shall at all times be liable for the payment upon demand of any debit balance or other obligations owing in any of my accounts with you; and, I shall be liable to you for any deficiency remaining in any such accounts in the event of the liquidation thereof, in whole or in part, by you or by me, and, I shall make payments of such obligations and indebtedness upon demand.

8. **Funds Availability** — I understand that available credit balances in my Brokerage Account will be automatically swept on a daily basis to the sweep vehicle of my choice ("Designated Sweep Vehicle"). The proceeds of any checks which I deposit to my Brokerage Account will be swept to the Designated Sweep Vehicle on the third business day after receipt by TD AMERITRADE and will begin earning dividends or interest on that day. I understand that access to such funds may be withheld for up to 10 calendar days to assure that such checks have not been returned unpaid. I may instruct TD AMERITRADE to change my Designated Sweep Vehicle at any time to another of the sweep vehicles, and acknowledge that such instruction shall constitute my authorization to liquidate existing balances in my Designated Sweep Vehicle and transfer such balances to the new sweep vehicle I have selected. I acknowledge that TD AMERITRADE reserves the right, at its sole discretion, to change the eligibility criteria for any sweep vehicle and may change or replace the sweep vehicles available to me.

**Money Market Account Sweep Feature** — If I have selected the TD Bank USA, N.A. Money Market Account ("MMA") as my Designated Sweep Vehicle, I understand that available cash in my TD AMERITRADE Brokerage Account will be automatically deposited in the MMA at the Bank. The MMA will be eligible for insurance by the FDIC of up to $100,000 principal and accrued interest per depositor in each recognized legal capacity (e.g., individual, joint, IRA) when aggregated with other deposits, including Certificates of Deposit, held at the Bank in the same capacity. Available cash balances will be deposited into the MMA without limit, even if the amount in the MMA exceeds $100,000. **I acknowledge that I am responsible for monitoring the total amount of deposits, including Certificates of Deposit, that I maintain at the Bank in order to determine the extent of Federal Deposit Insurance Coverage available to me.**

I acknowledge that the MMA constitutes a direct obligation of the Bank, and is not directly or indirectly an obligation of TD AMERITRADE. TD AMERITRADE does not guarantee in any way the financial condition of the Bank or the accuracy of any publicly available financial information concerning the Bank.

As required by federal regulations, the Bank reserves the right to require seven days prior notice before permitting a withdrawal out of the MMA. The Bank has indicated that it presently has no intention of exercising this right. In addition, the MMA has transfer limits that prevent using it as a transaction account.

**Deposit Procedures** — When available cash is first available for deposit, TD AMERITRADE will deposit available cash in my Brokerage Account into a MMA at the Bank. The minimum deposit for opening a MMA at the Bank, the minimum deposit eligible for a sweep, and the frequency of deposits may vary, depending on the type of TD AMERITRADE Brokerage Account I maintain.

**Withdrawal Procedures** — All withdrawals necessary to satisfy debits in my TD AMERITRADE Brokerage Account will be made by TD AMERITRADE as my agent. A debit will be created when I purchase securities, request a withdrawal of funds from my TD AMERITRADE Brokerage Account, write a check on my account, or use my ATM/VISA Check Card.

**Interest Rates** — The Bank will determine interest rates on the MMA Account based upon prevailing economic and business conditions. In addition, the Bank reserves the right to determine interest rates based upon the nature and scope of a customer's relationship with TD AMERITRADE. The interest rates paid with respect to the MMA may be higher or lower than the interest rates available to depositors making deposits directly with the Bank, or other depository institutions in comparable accounts. I may contact TD AMERITRADE to determine the current interest rate on the MMA. Interest will accrue on balances from the day they are deposited into the MMA through the business day preceding the date of withdrawal from the MMA. Interest will be accrued daily, and credited on the last business day of each month.

**Relationship with TD AMERITRADE** — TD AMERITRADE, through its affiliated clearing firm NISC, will act as my agent in establishing a MMA at the Bank, depositing funds into the MMA, and withdrawing funds from the MMA. No evidence of the MMA, such as a passbook or certificate, will be issued to me. Ownership of the MMA at the Bank will be evidenced by a book entry on the account records of the Bank, and by records maintained by TD AMERITRADE or NISC as my custodian and as record-keeper for the Bank.

TD AMERITRADE may, in its sole discretion, terminate my use of the Money Market Account Sweep Feature. If TD AMERITRADE terminates my use of the Money Market Account Sweep Feature, or does not wish to continue to act as my agent with respect to the MMA, I understand that I may deal directly with the Bank, subject to its rules with respect to maintaining deposit accounts.

Similarly, if I decide to terminate my use of the Money Market Account Sweep Feature, or that I no longer wish to have TD AMERITRADE act as my agent with respect to the MMA, I understand that I may establish a direct depository relationship with the Bank by requesting that my MMA balances be recorded on the account records of the Bank in my name, subject to the Bank's rules with respect to maintaining deposit accounts. Establishing a direct depository relationship with the Bank will result in the separation of my MMA balances from my TD AMERITRADE brokerage account.

TD AMERITRADE will receive a fee from the Bank in connection with the Money Market Account Sweep Feature and has the right to waive all or part of this fee. Other than applicable fees imposed by TD AMERITRADE on its brokerage accounts, there will be no charges, fees, or commissions imposed on my account with respect to the MMA.

Changes in Depository Institutions Participating in the Money Market Account Sweep Feature — Periodically, TD AMERITRADE may add depository institutions to the Money Market Account Sweep Feature. I will receive notification in advance of any such change, either by means of a letter, an entry on my TD AMERITRADE brokerage account statement, an entry on a confirmation, or by other means. If a depository institution ceases to make its MMA available through the Money Market Account Sweep Feature, I will be given an opportunity to establish a direct depository relationship with that institution outside of the Money Market Account Sweep Feature, or to transfer funds to another depository institution participating in the Money Market Account Sweep Feature, if available. The consequences of maintaining a direct depository relationship with a depository institution are discussed above under "Relationship with TD AMERITRADE."

Deposit Insurance — Funds in the MMA are insured by the FDIC, an independent agency of the U.S. government, to a maximum amount of $100,000 (including principal and interest) when aggregated with all other deposits, including Certificates of Deposit, held by me in the same recognized legal capacity at the Bank. Funds become eligible for deposit insurance immediately upon placement in the MMA. Any deposits that I maintain directly with the Bank, or through an intermediary, in the same recognized legal capacity in which the deposits in the MMA are maintained, will be aggregated with my deposits in the MMA for purposes of the $100,000 limit. I understand that I am responsible for monitoring the total amount of deposits that I have with the Bank in order to determine the extent of deposit insurance coverage available to me. TD AMERITRADE will not be responsible for any insured or uninsured portion of the MMA.

In the unlikely event that the Bank should fail, the MMA is insured, up to the $100,000 limit, for principal and interest accrued to the day the Bank is closed. Interest is determined for insurance purposes in accordance with federal law and regulations.

Questions about basic FDIC insurance coverage may be directed to TD AMERITRADE. Information may also be obtained by contacting the FDIC, Office of Compliance and Consumer Affairs, by letter (550 17th Street, N.W., Washington, DC 20249), by phone (877-275-3342, 800-925-4618 (TDD) or 202-942-3100) by e-mail (dcainternet@fdic.gov), or by accessing the FDIC Web site at fdic.gov.

TD AMERITRADE Cash — If I have selected TD AMERITRADE Cash as my Designated Sweep Vehicle, I understand that TD AMERITRADE will pay interest on available credit balances in my Brokerage Account based on its current rates and policies, which may be changed without notice. Interest will be accrued daily and credited on the last business day of each month.

## 9. Agreement to Arbitrate Controversies

This agreement contains a predispute arbitration clause. By signing an arbitration agreement the parties agree as follows:

• Arbitration is final and binding on the parties. All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

• The parties are waiving their right to seek remedies in court, including the right to jury trial. Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

• Pre-arbitration discovery is generally more limited than and different from court proceedings. The ability of the parties to obtain documents, witness statements, and other discovery is generally more limited in arbitration than in court proceedings.

• The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. The arbitrators do not have to explain the reason(s) for their award.

• The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

• The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

• The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

I agree that any controversy relating to any of my accounts or any agreement that I have with you will be submitted to arbitration conducted pursuant to the Code of Arbitration of the National Association of Securities Dealers, Inc. Arbitration must be initiated by service upon the other party of a written demand for arbitration or notice of intention to arbitration. Judgment, upon any award rendered by the arbitrator, may be entered in any court having jurisdiction. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (i) the class certification has been denied; or (ii) the class is decertified; or (iii) the client is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

10. Costs of Collection — The reasonable costs and expenses of collection of the debit balance and any unpaid deficiency in my accounts, including, but not limited to, attorney's fees incurred by you, shall be paid or reimbursed by me to you upon demand.

11. Security for Indebtedness — All securities and other property whatsoever which you may hold, carry, or maintain for any purpose, in or for any of my accounts, whether
individually or jointly held with others, are subject to a lien in favor for the discharge of all the indebtedness of me to you, and I hereby grant to you a continuing lien, security interest, and right of set-off in all such property and securities, whether now owned by me or hereafter acquired. You may hold securities and other property as security for the payment of any liability or indebtedness of me to you, and you shall have the right to transfer such securities and other property in any of my accounts from or to any other of my accounts, when in your judgment such transfer may be necessary for your protection. In enforcing your lien you shall have the right, with or without notice, to sell, assign, and deliver all or any part of the securities or other property in any of my accounts when you deem it necessary for your protection, and you shall have the discretion to determine which securities and properties are to be sold and which contracts are to be closed. You reserve the right to close transactions in my account if you believe there is inadequate security for my obligation or upon an event which in your opinion jeopardizes my account. You shall have all rights of a secured party under the Uniform Commercial Code.

12. The Laws of New York Govern — This agreement and its enforcement shall be governed BY THE LAWS OF THE STATE OF NEW YORK.

13. Scope, Transferability, and Termination of Services — This agreement shall cover, individually and collectively, all accounts (Cash, Margin, Options, or other) which I may open or reopen with you; and shall be binding upon my heirs, executors, administrators, successors, and assigns. This agreement shall also inure to the benefit of your successors, whether by merger, consolidation or otherwise, and assigns, and you may transfer my accounts and my agreements to your successors and assigns, without my consent. I understand that TD AMERITRADE may, at any time, at its sole discretion, close, deactivate, or block access to my account. I will remain responsible for the payment of all charges incurred in my Accounts.

14. Losses Due to Extraordinary Events — You shall not be liable for loss caused directly or indirectly by war, natural disasters, government restrictions, exchange, or market rulings or other conditions beyond your control. You also shall not be responsible for damages caused by equipment failure, communications line failure, unauthorized access, theft, systems failure, and other occurrences beyond our control.

15. Joint and Several Liability — If there is more than one owner of the account, then obligations under this agreement shall be joint and several. Each party to a joint account irrevocably appoints each of the other parties as attorney-in-fact to take all action on his or her behalf, and to represent him or her in all respects in connection with this Agreement. You shall be fully protected in acting upon the instructions of any account owner, in sending confirmation advice, notices or other communications to any account owner, or in otherwise dealing with any account owner.

16. Separation of Provisions; Headings — If any provision or condition of this agreement shall be held to be invalid or unenforceable by any court, or regulatory or self-regulating agency or body, such invalidity or unenforceability shall attach only to such provisions or conditions. The validity of the remaining provisions and conditions shall not be affected thereby, and this agreement shall be carried out as if such invalid or unenforceable provision or condition were not contained herein. The headings in this Agreement are for purposes of reference only and shall not in any way limit or affect the meaning or interpretation of any of the terms hereof.

17. Presumption of Receipt of Communications — Communications may be sent to me at my postal or electronic mail address given in the New Account Application as a mailing address, or at such other address as I may hereafter give you in writing, and all communication so sent, whether by mail, telegraph, messenger, or otherwise, shall be considered delivered to me personally, whether actually received or not.

18. SEC Rule 14b-1(c) — Communication Between Companies and Shareholders — I understand and agree that NISC will release my name, address, and security positions to requesting companies in which I own shares that are held in my account, unless I notify you in writing that I object.

19. Credit Information — I authorize you to make inquiries for the purpose of verifying my creditworthiness and to provide information regarding my performance under this agreement to credit reporting agencies and to your affiliates. I further understand that you may share this information with your affiliates to determine my eligibility for other products and services they may offer. I may opt out of such information sharing by providing you with written notification. I understand that, upon my request, you will tell me whether a credit report was requested and provide the name and address of the agency that furnished it.

20. No Advice or Recommendations — I acknowledge that you do not provide legal or tax advice and will not advise concerning the nature, potential value, or suitability of any unsolicited security transaction or investment strategy and I hereby agree to hold you harmless from any liability, financial or otherwise, as a result of any losses I may suffer with respect to such transaction or strategy.

21. Modification of Agreement — I understand that any alteration to this Agreement will be ineffective to relieve me of my obligations hereunder. You may unilaterally change these terms and conditions at any time by conspicuously posting notice of such change in the Client Agreement section of your Web site for a period of five (5) consecutive business days or by providing

written or electronic notice to me. Continued use of my account after such notice will constitute acknowledgment and acceptance of the revised terms and conditions.

22. Interest Charges on Debit Balances — I agree to pay interest on all debit balances on any of my accounts with you from time to time. Interest shall be computed and charged in accordance with your standard methods and procedures as in effect from time to time. In no event, however, shall such interest rates exceed the maximum rate permitted by applicable law.

23. Pledge of Securities and Other Property — All securities and other property now or hereafter held, carried, or maintained by you in or for any of my accounts individually or jointly with others, may be pledged, repledged, hypothecated, or rehypothecated by you from time to time without notice to me either separately or in common with other securities and other property for any amount due in my accounts or for any greater amount, and you may do so without retaining in your possession or under your control for delivery a like amount of similar securities or other property.

24. Short Sales — I agree that any "short" sale by me shall be so designated to you at the time such an order is placed and I hereby authorize you to mark any such order as being "short." I understand that acceptance of orders to sell securities short is subject to the ability to borrow an equivalent number of shares of the security that I wish to sell short. I agree that if market conditions change, or if you are no longer able to borrow the shares, you may repurchase for my account, at any time, the security that I sold short, and I agree to pay any costs relating in any way to the repurchase of that security.

25. Loan of Securities — You are authorized to lend to yourself or others any securities held by you in my margin account and to carry all securities lent as general loans and you shall have no obligation to retain under your possession and control a like amount of such securities. In connection with such loans, you may receive and retain certain benefits to which I will not be entitled. In certain circumstances, such loans may limit, in whole or in part, my ability to exercise voting rights of the securities lent. I will not enter an order in my Margin Account until I have read and understood the Margin Account Requirements and Truth in Lending Disclosure as set forth herein.

26. Margin Account Requirements — I shall at all times maintain such securities and other property in the accounts of the undersigned for margin purposes as you shall require from time to time. Margin requirements will change depending on requirements established by the Federal Reserve, NYSE, NASD or TD AMERITRADE, or when conditions require it or there is an undue concentration in one account. All margin accounts must maintain $2,000 minimum equity. TD AMERITRADE reserves the right to change margin requirements without notice. The total margin requirement for options (based upon prevailing market conditions) must be in the account prior to entering the order. Additional requirements resulting from market fluctuations must be satisfied on a timely basis. All premiums received from options writing may be applied against the above requirements. We suggest the opening of a money market account so that funds will be earning interest and on deposit for timely decisions.

27. Disclosure of Account Information to Third Parties —
I understand that TD AMERITRADE (or the Bank acting as its agent) may disclose information to third parties about my account or my transactions: (1) when it's necessary for completing transactions; (2) to verify the existence and condition of my account for a third party, such as a credit bureau or merchant; (3) to comply with a government agency or court order; (4) if I give you my permission; and (5) as otherwise authorized in this Agreement.

Please note only clients that have opted for electronic delivery of documents are bound by the following provision.

28. Consent to Electronic Delivery of Documents — I hereby authorize TD AMERITRADE to deliver correspondence and other communications (collectively "Communications") including, without limitation, confirmations, account statements, notices, margin and maintenance calls, prospectuses, and other official documents required in connection with my TD AMERITRADE account to the e-mail address I specify.

I further authorize TD AMERITRADE to deliver to me any such Communication by sending me, in lieu of such Communication, a notice directing me to an address on the World Wide Web ("Web") where the Communication is posted and from where it can be read and printed. Any such notice (hereinafter "Notice of Delivery by Web Posting") will include the specific Web address whereon the Communication has been posted. I agree that the sending by TD AMERITRADE of a Notice of Delivery by Web Posting shall constitute good and effective delivery to me of the Communication whether or not I follow the instructions of the notice and actually access the Communication via the Web.

I agree to immediately notify TD AMERITRADE either through the e-mail information section of its Web site or by a signed writing delivered by postal mail of any change in the e-mail address specified below. Communications, including but not limited to Notices of Delivery by Web Posting, sent by TD AMERITRADE to the e-mail address provided by me below shall, until written notice of any different address is received by TD AMERITRADE, be deemed to have been personally delivered to me whether actually received or not.

At my request, TD AMERITRADE will deliver to me a paper copy of the Communications. However, neither my request for a paper copy of any Communication nor delivery by TD AMERITRADE thereof by non-electronic means shall in any way imply that electronic delivery of such Communication did not constitute good and effective delivery in the first instance.

It is my responsibility to review upon first receipt, whether delivered to me by electronic mail or otherwise, all Communications, including confirmations of transactions. Transactions shall be binding upon me, if I do not object in writing within ten (10) days after the confirmation is delivered to me. In all cases, TD AMERITRADE reserves the right to determine the validity of my objection to the transaction.

If this is a Joint Account, each of us agrees that each co-account owner shall have authority to receive Communications at the email address specified. Each of us agrees that notice to any co-account owner shall be deemed to be notice to all co-account owners. Each joint owner agrees that he or she shall be jointly and severally liable for the Account. TD AMERITRADE reserves the right to require written instructions from all co-account owners.

Margin requirements will change depending on Federal Reserve requirements, NYSE and NASD requirements, market conditions or if there is an undue concentration in one account. Margin accounts require a minimum of $2,000 in initial equity. If the equity in a margin account falls below $2,000 due to market depreciation, that is acceptable as long as the account is at or above the maintenance requirement.

|  | INITIAL REQUIREMENT | MAINTENANCE REQUIREMENT |
|---|---|---|
| **Long Stocks** | | |
| Below $3 per share | 100% | 100% |
| $3 per share or more | 50% | 30% |
| Concentrated accounts | 50% | 40% or higher |
| High-Risk securities | 50% | 40% or higher |
| **Short Stocks** | | |
| Below $5 per share | Not eligible for short sale | 100% |
| $5 per share or more | 50% | Greater of 30% or $5 per share |
| Concentrated accounts | 50% | 40% or higher |
| High-Risk securities | 50% | 40% or higher |

All short sales are subject to our ability to borrow the stock. Stock which can no longer be borrowed must be bought-in immediately.

| **Bonds** | (Bonds under $500 are not marginable.) | MV = Market Value |
|---|---|---|
| Corporate Bonds | Greater of 35% of MV or 18% Face | Greater of 35% of MV or 18% Face |
| Zero Coupon – Corp. | Greater of 35% of MV or 18% Face | Greater of 35% of MV or 18% Face |
| Convertible Bonds | 50% | 30% |
| Municipal Bonds | Greater of 15% of MV or 10% Face | Greater of 15% of MV or 10% Face |
| Zero Coupon – Munis | Greater of 15% of MV or 10% Face | Greater of 15% of MV or 10% Face |
| | | |
| **US Gov't Issues** | (Bonds under $500 are not marginable.) | MV = Market Value |
| US T-Bills, Notes & Bonds | 10% | 5% less than 20 year maturity 10% greater than 20 year maturity |
| GMNA, FNMA, FHLMC ($50,000 Min) | 10% | 5% less than 20 year maturity 10% greater than 20 year maturity |
| US Zero Coupon & Strip Issues | Greater of 35% of MV or 18% Face | Greater of 35% of MV or 18% Face |

*Options*

| Long Options | 100% of the option premium |
| --- | --- |
| Uncovered Equity & Index Options | Option Premium plus 25% of underlying security's market value minus any amount out of the money. Minimum is the greater of the option premium plus 10% of the underlying security's market value for call options (10% of the strike price for put options) or $500 per contract. Minimum equity is the greater of $25,000 or the initial requirement. For an uncovered put where the market value is less than $25,000, the equity required is 100% of the exercise price. |
| Covered Spreads – long expires after or simultaneous with short | If exercise of all sides results in a loss, requirement is maximum potential loss. If exercise of all sides results in a profit, requirement is cost of spread. The minimum equity is $250 per contract for equity options or $500 per contract for index options in addition to initial requirement. |
| Uncovered Spreads | Same as uncovered requirements above |
| Uncovered Straddles or Combinations | Greater of the uncovered requirements of put or call plus the premium of the other. Minimum equity is the greater of the initial requirement or $25,000. |

The total margin requirement for options (based upon prevailing market conditions) must be in the account prior to entering the order. Additional requirements resulting from market fluctuations must be satisfied on a timely basis. All premiums received from option writing may be applied against the above requirements. We suggest the use of one of our sweep vehicles so that funds will be earning interest and on deposit for timely decisions.

Truth in Lending Disclosure
Pursuant to (Rule 10b-16 SEC Act of 1934) the Truth in Lending law, the following disclosure is provided so that you may be fully informed concerning our charges in connection with any credit that we may extend to you.

Margin and Other Accounts
If you have accounts other than a cash account, you will be charged interest on any credit extended to or maintained for you by us for the purpose of purchasing, carrying, or trading in any security.

The annual rate of interest will be determined by the size of the net debit balance during the interest period. These rates are subject to change without notice in accordance with any changes in our Base Rate. Our Base Rate is set in reference to commercially recognized interest rates, industry conditions relating to the extension of margin credit, and general market conditions. If your margin interest rate increases for any reason other than a change in the Base Rate, we will give you written notice at least 30 days prior to that change.

Margin Interest Rates
Debit Balance Rate
$1,000,000 and above Base Rate + 0.75%
$ 250,000 – $ 999,999 Base Rate + 1.25%
$ 50,000 – $ 249,999 Base Rate + 1.75%
$ 25,000 – $ 49,999 Base Rate + 2.25%
$ 10,000 – $ 24,999 Base Rate + 2.75%
$ 1– $ 9,999 Base Rate + 3.25%

The current base rate can be obtained by contacting TD AMERITRADE or visiting tdameritrade.com. Margin interest is reflected on your monthly statement. (Your margin interest is posted on the second to last business day of the month.) Interest rates will vary based on any changes to the Base Rate.

The Method of Computing Interest
The method of computing interest will be as follows: Interest is based on the average debit balance during the interest period. In general, our interest period runs from the next to last business day of the prior month to the third to last business day of the current month. To compute your interest for such period it will be necessary to use the prior month's and the current month's statement, as follows: take the debit balance on the last business day of the prior month; each day add to it any debits appearing on your statement and subtract any credits to determine the day's debit balance. Total each day's debit balance and divide by the number of days a debit balance existed for that interest period. Apply the appropriate interest rate to the average debit balance for the interest period. Your monthly statements will show the opening and closing debit balances.

If there is a debit balance in the cash account and there is a margin account, interest will be calculated on the debit balance in the cash account and charged to the margin account. Free credit balances in all accounts (except short accounts) which you may have with us will be set off against debit balances. In addition to interest on debit balances, interest at the foregoing rates will be charged on proceeds of sales paid to you prior to the settlement date and on late payments, including those in cash accounts.

All securities in any of your accounts are collateral for any debit balances — i.e., for any balances owed by you to us. A lien is created by those debits to secure the amount of money owed to us. This means securities in your accounts can be sold to reduce or liquidate entirely any balance in any of your accounts, as is authorized in our Margin/Loan Consent and Client Agreement covering margin accounts.

I understand that you may take such action without prior notification and that your failure to take any of the above actions will not be considered a waiver of your rights to take such action in later instances. I further agree to reimburse you for all expenses, fees, commissions, or losses, which may be incurred as a result of such action.

In connection with margin accounts, if there is a decline in the market value of your securities which are collateral for your debits, it may be necessary for us to request additional margin. Ordinarily, a request for additional margin will be made when the equity in the account falls below our margin maintenance requirements, which may change from time to time without notice — the "equity" being the excess market value of the securities in the account over the debit balances. We retain the right to require additional margin any time we deem it desirable, and these margin calls can be met by delivery of cash or additional marginable securities.

**Cash Management Services Agreement**

This Agreement between the account owner(s) and TD AMERITRADE sets forth the terms and conditions governing the TD AMERITRADE cash management services ("CMS").

Definitions:
"I," "me," "my," or "account owner" means each account owner who signs the CMS application.

"You," "your," or "TD AMERITRADE" means TD AMERITRADE, Inc., a wholly owned subsidiary of TD AMERITRADE Holding Corporation

"Bank" means TD Bank, USA.

"NISC" means National Investor Services Corp., its employees, representatives, officers, directors, agents, successors and assigns.

"CMS" means the TD AMERITRADE cash management services, which consists of my Brokerage Account, and a Designated Sweep Vehicle that may be accessed by check or ATM/VISA® Check Card.

"Designated Sweep Vehicle" means the sweep vehicle that I have designated on my account application for holding uninvested cash balances.

"Brokerage Account" means the securities brokerage account opened in my name at TD AMERITRADE and includes my Designated Sweep Vehicle.

"Checks" mean checks which are issued to me and which are drawn on my Brokerage Account through CMS.

"Card" means the ATM/VISA Check Card that I may automatically receive to access my Brokerage Account through CMS.

"Investors Check Advance" means my available margin credit, which can be used as overdraft protection when writing a check drawn on my Brokerage Account or by use of my card.

"Business Day" means Monday through Friday, excluding Bank and New York Stock Exchange holidays.

"Available Cash Balance" means amounts held in my Designated Sweep Account and any additional amounts held in any other Money Market Fund or Money Market Account included in my Brokerage Account.

"Available Margin Credit" means the amount of credit TD AMERITRADE may extend to me based on the value of marginable securities held in my margin and short account.

"FDIC" means Federal Deposit Insurance Corporation.

"SIPC" means Securities Investor Protection Corporation.

"Electronic Fund Transfer" means any transfer of funds that is initiated through an electronic terminal, phone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing the bank to debit or credit our account.

The term includes, but is not limited to:
• Preauthorized Electronic Fund transfers, such as direct deposit of Social Security payments, payroll payments, U.S. Treasury checks to your accounts, interest, or dividend payments;
• Automatic withdrawals that recur at substantially regular intervals from our accounts;
• Point-of-Sale transfers (POS);
• Automated Teller Machine transfers (ATM);
• Phone Banking transfers;
• Other Banking transfers.

This term does not include payments made by checks, draft, or similar paper instrument, Fedwire, or similar wire transfer made at an electronic terminal or elsewhere.

Description of CMS — CMS consists of a Brokerage Account that is linked to a Designated Sweep Vehicle. CMS permits me to write checks and use the card issued to me to access my Brokerage Account.

Sweep Feature — I understand that available credit balances in my Brokerage Account will be automatically swept on a daily basis to the sweep vehicle of my choice ("Designated Sweep Vehicle"). The proceeds of any checks which I deposit to my Brokerage Account will be swept to the Designated Sweep Vehicle on the third business day after receipt by TD AMERITRADE, and will begin earning dividends or interest on that day. I understand that access to such funds may be withheld for up to 10 calendar days to ensure that such checks have not been returned unpaid. Such holds may result in the dishonor of checks or rejection of card transactions if funds and/or Available Margin Credit are not otherwise available within my Brokerage Account. I may instruct TD AMERITRADE to change my Designated Sweep Vehicle at any time to another of the sweep vehicles, and acknowledge that such instruction shall constitute my authorization to liquidate existing balances in my Designated Sweep Vehicle, and transfer such balances to the new sweep vehicle I have selected. I acknowledge that TD AMERITRADE reserves the right, at its sole discretion, to change the eligibility criteria for any sweep vehicle, and may change or replace the sweep vehicles available to me.

Money Market Account Sweep Feature — If I have selected the TD Bank USA, N.A. Money Market Account ("MMA") as my Designated Sweep Vehicle, I understand that available cash in my TD AMERITRADE Brokerage Account will be automatically deposited in the MMA at the Bank. The MMA will be eligible for insurance by the FDIC of up to $100,000 principal and accrued interest per depositor in each recognized legal capacity (e.g., individual, joint, IRA) when aggregated with other deposits, including Certificates of Deposit, held at the Bank in the same capacity. Available cash balances will be deposited into the MMA without limit, even if the amount in the MMA exceeds $100,000. I acknowledge that I am responsible for monitoring the total amount of deposits, including Certificates of Deposit, that I maintain at the Bank in order to determine the extent of Federal Deposit Insurance Coverage available to me.

I acknowledge that the MMA constitutes a direct obligation of the Bank, and is not directly or indirectly an obligation of TD AMERITRADE. TD AMERITRADE does not guarantee in any way the financial condition of the Bank, or the accuracy of any publicly available financial information concerning the Bank.

As required by federal regulations, the Bank reserves the right to require seven days prior notice before permitting a withdrawal out of the MMA. The Bank has indicated that it presently has no intention of exercising this right. In addition, the MMA has transfer limits that prevent using it as a transaction account.

Deposit Procedures — When available cash is first available for deposit, TD AMERITRADE will deposit available cash from my Brokerage Account into a MMA at the Bank. The minimum deposit for opening a MMA at the Bank, the minimum deposit eligible for a sweep, and the frequency of deposits may vary, depending on the type of TD AMERITRADE Brokerage Account I maintain.

Withdrawal Procedures — All withdrawals necessary to satisfy debits in my TD AMERITRADE Brokerage Account will be made by TD AMERITRADE as my agent. A debit will be created when I purchase securities, request a withdrawal of funds from my TD AMERITRADE Brokerage Account, write a check on my account, or use my ATM/VISA Check Card.

Interest Rates — The Bank will determine interest rates on the MMA based upon prevailing economic and business conditions. In addition, the Bank reserves the right to determine interest rates based upon the nature and scope of a customer's relationship with TD AMERITRADE. The interest rates paid with respect to the MMA may be higher or lower than the interest rates available to depositors making deposits directly with the Bank or other depository institutions in comparable accounts. I may contact TD AMERITRADE to determine the current interest rate on the MMA. Interest will accrue on balances from the day they are deposited into the MMA through the business day preceding the date of withdrawal from the MMA. Interest will be accrued daily, and credited on the last business day of each month.

Relationship with TD AMERITRADE — TD AMERITRADE, through its affiliated clearing firm, NISC, will act as my agent in establishing a MMA at the Bank, depositing funds into the MMA, and withdrawing funds from the MMA. No evidence of the MMA, such as a passbook or certificate, will be issued to me. Ownership of the MMA at the Bank will be evidenced by a book entry on the account records of the Bank, and by records maintained by TD AMERITRADE or NISC as my custodian and as record keeper for the Bank.

TD AMERITRADE may, in its sole discretion, terminate my use of the Money Market Account Sweep Feature. If TD AMERITRADE terminates my use of the Money Market Account Sweep Feature, or does not wish to continue to act as my agent with respect to the MMA, I understand that I may deal directly with the Bank, subject to its rules, with respect to maintaining deposit accounts.

Similarly, if I decide to terminate my use of the Money Market Account Sweep Feature, or that I no longer wish to have TD AMERITRADE act as my agent with respect to the MMA, I understand that I may establish a direct depository relationship with the Bank by requesting that my MMA balances be recorded on the account records of the Bank in my name, subject to the Bank's rules with respect to maintaining deposit accounts. Establishing a direct depository relationship with the Bank will result in the separation of my MMA balances from my TD AMERITRADE brokerage account.

TD AMERITRADE will receive a fee from the Bank in connection with the Money Market Account Sweep Feature, and has the right to waive all or part of this fee. Other than applicable fees imposed by TD AMERITRADE on its brokerage accounts, there will be no charges, fees, or commissions imposed on my account with respect to the MMA.

Changes in Depository Institutions Participating in the Money Market Account Sweep Feature — Periodically, TD AMERITRADE may add depository institutions to the Money Market Account Sweep Feature. I will receive notification in advance of any such change, either by means of a letter, an entry on my TD AMERITRADE brokerage account statement, an entry on a confirmation, or by other means. If a depository institution ceases to make its MMA available through the Money Market Account Sweep Feature, I will be given an opportunity to establish a direct depository relationship with that institution outside of the Money Market Account Sweep Feature, or to transfer funds to another depository institution participating in the Money Market Account Sweep Feature, if available. The consequences of maintaining a direct depository relationship with a depository institution are discussed above under "Relationship with TD AMERITRADE."

Deposit Insurance — Funds in the MMA are insured by the FDIC, an independent agency of the U.S. government, to a maximum amount of $100,000 (including principal and interest) when aggregated with all other deposits, including Certificates of Deposit, held by me in the same recognized legal capacity at the Bank. Funds become eligible for deposit insurance immediately upon placement in the MMA. Any deposits that I maintain directly with the Bank, or through an intermediary, in the same recognized legal capacity in which the deposits in the MMA are maintained, will be aggregated with my deposits in the MMA for purposes of the $100,000 limit. I understand that I am responsible for monitoring the total amount of deposits that I have with the Bank in order to determine the extent of deposit insurance coverage available to me. TD AMERITRADE will not be responsible for any insured or uninsured portion of the MMA.

In the unlikely event that the Bank should fail, the MMA is insured, up to the $100,000 limit, for principal and interest accrued to the day the Bank is closed. Interest is determined for insurance purposes in accordance with federal law and regulations. Questions about basic FDIC insurance coverage may be directed to TD AMERITRADE. Information may also be obtained by contacting the FDIC, Office of Compliance and Consumer Affairs, by letter (550 17th Street, N.W., Washington, DC 20249), by phone (877-275-3342, 800-925-4618 (TDD) or -202-942-3100) by e-mail (dcainternet@fdic.gov), or by accessing the FDIC Web site at fdic.gov.

TD AMERITRADE Cash — If I have selected TD AMERITRADE Cash as my Designated Sweep Vehicle, I understand that TD AMERITRADE will pay interest on available credit balances in my Brokerage Account based on its current rates and policies, which may be changed without notice. Interest will be accrued daily, and credited on the last business day of each month.

Checks — I understand that I may write checks on my Brokerage Account in any amount in U.S. dollars. I understand that my checks are provided to me by TD AMERITRADE and not by the Bank. I understand that the checks are drawn against my Brokerage Account. I further understand that the checks are not drawn on an account in my name at the Bank although they are payable through the Bank. I further understand that the checks are intended to facilitate access to my Brokerage Account and that CMS is not a bank account or intended as a substitute for a traditional checking account. I understand that you reserve the right to limit my check-writing privileges if I write an excessive number of checks.

I understand that canceled checks will not be returned to me, though I may request copies of such checks. TD AMERITRADE reserves the right to pay post-dated checks, although it is not obligated to do so. TD AMERITRADE also reserves the right not to pay any check if it determines, in its sole discretion, that the check is incomplete or improperly completed.

I understand that any check that would cause me to exceed the Available Cash Balances in my Brokerage Account and any Available Margin Credit may not be honored.

I understand that fees will be imposed for check reorders ($9.95 for 100 checks), stop payments ($15.00), checks returned for insufficient funds ($25.00), and any other special services, and that these fees are subject to change without notice.

In order for me to stop payment on any check, I must notify you of the exact amount of the check, the number, date and payee of the check, and my Brokerage Account number. If such notification is made orally, it will be valid for 14 days unless confirmed in writing. A written stop payment order is effective for six (6) months. If any information I supply you is not correct or provided to TD AMERITRADE in a manner that does not provide TD AMERITRADE reasonable opportunity to stop payment of the check, or if I do not promptly comply with a request for other reasonable information about the check, neither you nor the Bank will be responsible if the check is not stopped.

ATM/VISA® Check Card — I understand that the ATM/VISA Check Card is provided to me in order to obtain cash withdrawals from Available Cash Balances in my Brokerage Account at a participating network automated teller machine. In addition, my card may be used to pay for goods or services from any merchant that participates in the VISA system, and I authorize TD AMERITRADE to charge against Available Cash Balances in my Brokerage Account to satisfy my Card transactions. I understand that regardless of the balances in my Brokerage Account on a particular day, daily ATM cash withdrawals may not exceed $1,000 per day and may be lowered or increased at the sole discretion of TD AMERITRADE, and that some participating machines may impose restrictions on the maximum amount of withdrawals per day. I understand that merchant transactions and authorizations may not exceed $2,500 per day and may be lowered or increased at the sole discretion of TD AMERITRADE. I understand that usage of my card will be governed by the rights and responsibilities set out in this Agreement and applicable state and federal law. I understand that when I use an ATM not owned by TD AMERITRADE, I may be charged a fee by the ATM operator or any network used (and I may be charged a fee for a balance inquiry even if I do not complete a fund transfer). I also understand that additional charges may apply for any Cash Advance I obtain through a teller and that the card may be canceled by the Bank or TD AMERITRADE at any time without prior notice.

With respect to International Exchange Rates, I understand that the Exchange Rate between the transaction currency and the billing currency used for processing International transactions is a rate selected by VISA from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate VISA itself receives, or the government-mandated rate in effect for the applicable central processing date in each instance, plus or minus any adjustment determined by the Issuer.

Payment of Items — I understand that all Brokerage Account purchase transactions, checks which I write, and card transactions will be accumulated daily, and that you will promptly pay each on my behalf to the extent that sufficient funds can be provided from Available Cash Balances in my Brokerage Account; from other available credit balances in my Brokerage Account; and if I have been approved as a margin account, from margin loans made by TD AMERITRADE within the Available Margin Credit of my Brokerage Account. I understand that if any checks which I write or any card transactions access my Available Margin Credit ("Investors Check Advance"), that any such amount will be a loan by TD AMERITRADE to me at the same rate TD AMERITRADE generally charges for margin loans and will be secured by securities in my Brokerage Account. I understand that any transfers into my Brokerage Account made through money transfers will not be available to pay items for five (5) business days following the day of the transfer. For example, if you make a transfer on Monday, it will be available on the following Monday.

Minimum Balance — I understand that TD AMERITRADE reserves the right to impose a $5 per month service charge for any month-end for which the balance of my Brokerage Account does not equal or exceed $1,000 in cash and securities. I agree that such charges, along with any other service charges, will be automatically debited from my Brokerage Account.

Termination of CMS — I may terminate CMS at any time by giving you written notice.
TD AMERITRADE may terminate any or all of the services provided under this Agreement at any time, and for any reason, at its sole discretion. Closing an account or terminating services will not affect any rights and obligations incurred prior to closure or termination, including my obligation to pay card transactions, checks, or other charges. Upon termination of CMS, I agree that I will destroy all cards and unused checks in my possession.

Security Interest — As security for any indebtedness or obligation I have incurred to TD AMERITRADE or to the Bank in connection with CMS, I grant TD AMERITRADE a security interest in any and all securities or property held now or in the future by TD AMERITRADE in any of my accounts or any other property TD AMERITRADE may hold for me. At its sole discretion without prior notice and for its sole protection, TD AMERITRADE may sell or transfer money, securities, or rights to any portion of any account to satisfy a margin deficiency or other obligation. Balances in my Designated Sweep Vehicle are also subject to a general lien for the discharge of my obligation to TD AMERITRADE or to the Bank, and TD AMERITRADE may utilize such balances to satisfy my obligations without further notice or demand. No provision of this Agreement concerning liens or security interests shall apply to any account to the extent such application would be in conflict with any provision of ERISA or the Internal Revenue Code relating to Retirement Accounts.

Rights and Responsibilities Regarding ATM/VISA Check Card Errors or Questions About Transactions — I will call at once if I think my statement or transaction record is wrong or if I need more information about a transaction listed on my statement or transaction record. The phone number to call is 800-934-4448. TD AMERITRADE must hear from me not later than 60 days after the date I've been sent the first statement on which the problem or error appeared. If I tell you orally, I understand that you may require that I send you my complaint or question in writing within ten (10) business days to:

TD Bank USA, N.A.
Attn: Banking Services
31 West 52nd Street
New York, NY 10019

You will need the following information: (1) my name, Brokerage Account number, and Card number; (2) a description of the error or transaction I am unsure about, and I will explain as clearly as I can why I believe it's an error or why I need more information; and (3) the date and dollar amount of the transaction or suspected error. You may also require that my letter be notarized.

You will tell me the results of your investigation within ten (10) business days after you hear from me and you will correct any error promptly. If you need more time, however, you may take up to 45 days (90 calendar days if the transfer involved a merchant transaction or a foreign initiated transfer) to investigate my complaint or question. If you need more time, you will recredit my account within ten (10) business days for the amount I think is in error, so that I will have the use of the money during the time it takes for you to complete your investigation. If you ask me to put my complaint or questions in writing and you do not receive it within ten (10) business days, you are not required to recredit my account. If you decide there was no error, you will send me a written explanation within three (3) business days after you complete your investigation. I may ask for copies of the documents used in your investigation.

Loss, Theft, or Unauthorized Transfers — I will call you at once if I believe that my Card has been lost or stolen, or if someone has transferred or may transfer money from my account without my permission. Phoning is the best way to minimize losses. A problem can be reported by calling 800-934-4448.

Liability in Case of Loss, Theft, or Unauthorized Transfers —
I understand that the loss, theft, or unauthorized use of my Card could cause me to lose all of the cash assets available in my Brokerage Account through CMS. However, I will not be liable for unauthorized use of my Card that occurs after I tell you about

the loss, theft, or unauthorized use of my Card. I understand that you may, to the extent allowed under applicable law, increase the limit of my liability for unauthorized use if you determine that I was grossly negligent or fraudulent in the handling of my Card.

Point-of-Sale Transfers — If I tell you AT ONCE that my card was lost or stolen, I will not be liable for the unauthorized point-of-sale transactions. If I do not tell you within 60 days after the statement was mailed to me that includes the unauthorized point-of-sale transaction, I may not recover any money I lost after the 60 days, if you can prove that you could have stopped someone from taking the money had I told you in time.

ATM Transactions — I will tell you AT ONCE if I believe my card and/or personal identification number has been lost or stolen. Phoning is the best way of keeping my possible losses down. If I tell you within two (2) business days, I can lose no more than $50 if someone used my card and/or personal identification number without your permission. (If I believe my card and/or personal identification number has been lost or stolen, and tell you within two (2) business days after I learn of the loss or theft, I can lose no more than $50 if someone used my card and/or personal identification number without my permission.)

If I do NOT tell you within two (2) business days after I learn of the loss or theft of my card and/or personal identification number, and you can prove you could have stopped someone from using my card and/or personal identification number without my permission if I had told you, I can lose as much as $500.

Also, if my statement shows transactions that I did not make or authorize, I will tell you at once. If I do not tell you within 60 days after the statement was mailed to me that includes the unauthorized transaction, I may not recover any money I lost after the 60 days, if you can prove that you could have stopped someone from taking the money had I told you in time.

Liability for Failure to Complete Transactions — If an electronic transfer is not completed on time or in the correct amount according to the agreements governing CMS, TD AMERITRADE may be liable for resulting losses or damages. However, there are some exceptions. For instance, TD AMERITRADE (and the Bank acting as its agent) will not be liable if:
(a) Through no fault of TD AMERITRADE (or the Bank), the amount of the transfer would exceed my available balance or available margin if applicable; or
(b) Circumstances beyond the control of TD AMERITRADE (or the Bank) (such as fire or flood) prevent the transfer, despite reasonable precautions that were taken; or
(c) The electronic terminal, electronic system, or cash machine was not working properly, and I knew about the breakdown when the transfer was started; or
(d) The cash machine where I was obtaining cash did not have enough cash; or
(e) As provided by applicable law.

Disclosure of Account Information to Third Parties — I understand that TD AMERITRADE (or the Bank acting as its agent) may disclose information to third parties about my account or my transactions: (1) when it's necessary for completing transactions; (2) to verify the existence and condition of my account for a third party, such as a credit bureau or merchant; (3) to comply with a government agency or court order; (4) if I give you my permission; and (5) as otherwise authorized in this Agreement. I further understand that this information may be shared by TD AMERITRADE with its parent company and affiliates to determine my eligibility for other products and services they may offer. I may opt out of such information sharing by providing you with written notification.

My Right to Receive Documentation — A summary of my Electronic Fund Transfer activity will be included in my monthly statement. I may request additional documentation by calling my investment consultant. A fee may be imposed.

Changes to These Rights and Responsibilities — From time to time, the rights and responsibilities in connection with electronic transfers may change. TD AMERITRADE will notify me, as required by law, of any changes; however, TD AMERITRADE is not required to notify me in advance if the change is necessary for security reasons.

Refusal to Honor Card or Checks — Neither TD AMERITRADE nor the Bank is responsible for any person's action in refusing to honor or accept my Card or Checks, or for any person's action in taking possession of my Card or Checks.

Brokerage Agreement
I understand and agree that I continue to remain bound by the terms and conditions of the Client Agreement which governs my Brokerage Account and that all such terms and conditions contained in the Client Account Agreement, including the pre-dispute arbitration clause in paragraph 9 of the Client Account Agreement, shall also govern CMS.

GOVERNING LAW
This agreement shall be governed by the laws of the State of New York.

**Online Account Agreement**

In consideration of TD AMERITRADE authorizing me to access and effect transactions in my TD AMERITRADE account(s) online (including, without limitation, via personal computer, wireless or handheld device, Web-ready phone), I hereby agree to comply with all of the terms and conditions set forth in this Agreement which supplement the terms and conditions of any other agreement(s) applicable to my account.

1. General —

1.1 I authorize TD AMERITRADE to honor my electronic instructions relating to my account(s) with TD AMERITRADE, including, but not limited to, instructions to buy or sell securities and other investment products.

1.2 I am responsible for obtaining or providing all phone access lines, phone, and computer equipment (including modem), or other access devices necessary to access my TD AMERITRADE accounts(s) online.

1.3 I acknowledge that TD AMERITRADE can support the current "browser" software specifically recommended by TD AMERITRADE for online use. I acknowledge that
TD AMERITRADE is not responsible for notifying me of any upgrades or enhancements to any such "browser" software.

1.4 I acknowledge that TD AMERITRADE reserves the right, in its sole discretion, to terminate my access to TD AMERITRADE's online service, in whole or in part, at any time, without notice for any reason whatsoever, including, but not limited to, unauthorized use of my password(s) or account number(s), restrictions or margin calls in my brokerage account, or breach of this Agreement.

2. Limitation of Liability —

2.1 I acknowledge that financial market data and other information that can be accessed online via TD AMERITRADE's online service, located at tdameritrade.com (the "Information"), may be provided by TD AMERITRADE, its affiliates or by third parties (collectively "Information\Providers"). The accuracy, completeness, timeliness, or correct sequencing of the information is not guaranteed by TD AMERITRADE, the Information Providers, or any parties transmitting the Information ("Information Transmitters"). There may be delays, omissions, errors, or inaccuracies in the provision of the Information. I agree that TD AMERITRADE, the Information Providers, and the Information Transmitters shall not have any liability, contingent or otherwise, for the accuracy, completeness, timeliness or correct sequencing of the Information, or for any decisions made, or actions taken by me in reliance upon the Information, or for interruption of any data, Information, or other aspects of online access to TD AMERITRADE. Should any such Information prove defective, I (and not TD AMERITRADE, the Information Providers, or the Information Transmitters) assume the entire responsibility for its use.

2.2 I AGREE THAT MY USE OF TD AMERITRADE'S ONLINE SERVICE IS AT MY SOLE RISK. THE INFORMATION, AND ALL ASPECTS OF THE SERVICE
(INCLUDING, BUT NOT LIMITED TO, ORDER EXECUTION) ARE PROVIDED ON AN "AS IS" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF TITLE OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN THOSE WARRANTIES, IF ANY, WHICH ARE IMPLIED BY AND INCAPABLE OF EXCLUSION, RESTRICTION, OR MODIFICATION UNDER THE LAWS APPLICABLE TO THIS AGREEMENT. NO ORAL ADVICE OR WRITTEN INFORMATION GIVEN BY TD AMERITRADE, ANY OF ITS EMPLOYEES OR AGENTS, ANY INFORMATION PROVIDERS, OR ANY INFORMATION TRANSMITTERS SHALL CREATE A WARRANTY; NOR SHALL I RELY ON ANY SUCH INFORMATION OR ADVICE.

2.3 I agree that TD AMERITRADE, the Information Providers, and the Information Transmitters will not be liable for any technical delay or failure of TD AMERITRADE's online service or any delay or failure to provide TD AMERITRADE's online service, including the execution of any securities order. In addition to the other limitations on liability set forth herein, neither TD AMERITRADE, nor the Information Providers, nor the Information Transmitters shall be liable for any loss resulting from a cause over which such entity does not have direct control, including, but not limited to, failure of electronic or mechanical equipment or communication lines, phone, or other interconnect problems, unauthorized access, theft, operator errors, severe weather, earthquakes, strikes, or other labor problems.

2.4 UNDER NO CIRCUMSTANCES, INCLUDING NEGLIGENCE, SHALL TD AMERITRADE, THE INFORMATION PROVIDERS, OR THE INFORMATION
TRANSMITTERS BE LIABLE TO ME OR ANYONE ELSE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES
(INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, TRADING LOSSES, AND DAMAGES THAT RESULT FROM INCONVENIENCE, DELAY, OR LOSS OF THE USE OF TD AMERITRADE'S ONLINE SERVICE), EVEN IF TD AMERITRADE, THE INFORMATION PROVIDERS, OR THE INFORMATION TRANSMITTERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES. I AGREE THAT I WILL HAVE SOLE AND COMPLETE RESPONSIBILITY FOR ANY DECISION MADE OR ACTION TAKEN BY ME IN RELIANCE UPON TD AMERITRADE'S ONLINE SERVICE, AND/OR INFORMATION.

2.5 SOME STATES DO NOT ALLOW LIMITATIONS ON HOW LONG IMPLIED WARRANTIES LAST, THE EXCLUSION OR LIMITATION OF INCIDENTAL OR
CONSEQUENTIAL DAMAGES, OR THE EXCLUSION OF CERTAIN IMPLIED WARRANTIES, SO THAT THESE DISCLAIMERS AND LIMITATIONS MAY NOT
APPLY TO ME.

3. Copyright — The Information provided by means of TD AMERITRADE's online service is the property of TD AMERITRADE, the Information Providers, or others, and is protected by copyright and/or by contractual restrictions on its use. I may make single copies of Information displayed on TD AMERITRADE's online service only if they are for my own personal, non-commercial use, and if I preserve the copyright or other notices contained in or associated with them. I may not distribute such

copies to others, whether or not for a charge or other consideration. I agree not to reproduce, retransmit, disseminate, sell, distribute, publish, broadcast, circulate, or commercially exploit the Information in any manner without the express written consent of TD AMERITRADE and the relevant Information Provider(s). I agree to comply with all written terms and conditions relating to the use of the Information in order to protect the contractual, statutory, and common-law rights of TD AMERITRADE and the Information Providers in the Information and other materials distributed by means of TD AMERITRADE's online service.

4. Password Protection and Prevention of Loss or Unauthorized Use —

4.1 I acknowledge that I have received a password and/or access number in the form of one or more numbers, codes, or other sequences that provide access to my account(s) by means of TD AMERITRADE's online service. I accept full responsibility for the use and protection of the password and/or access number and any transaction occurring in any account(s) opened, held, or accessed by use thereof. The use and storage of any data — including without limitation any password or access number, portfolio information, transaction activity, account balances, or other information on your computer — is my sole risk and responsibility.

4.2 I accept full responsibility for monitoring my account(s). I agree immediately to notify TD AMERITRADE if I become aware of any of the following:

a. Loss or theft of my access number(s), password(s), or account number(s);

b. Unauthorized use of my access number(s), password(s), or account number(s), or any unauthorized use of TD AMERITRADE's online service, or any Information;

c. My failure to receive a message from TD AMERITRADE that an order initiated by me through TD AMERITRADE's online service has been received and/or executed;

d. My failure to receive accurate confirmation of an order or its execution within five (5) business days after transmitting the order through TD AMERITRADE's online service;

e. Any receipt of confirmation of an order that I did not place, or any inaccurate or conflicting report concerning your account balances, securities positions, or transaction history;

f. Any incorrect credit to my account in the form of cash, credit, or securities; or

g. Any loss, theft of, or unauthorized access to, a computer or any electronic medium, such as a Diskette, containing a copy of the Software or access number(s), password(s), and/or account number(s).

4.3 I will be solely responsible for the confidentiality and use of my access number(s), password(s), and account number(s). I will also be solely responsible for all orders entered through and under your access number(s), password(s), and account number(s), and any orders so received by TD AMERITRADE will be deemed to have been received from me. In the event of a breach of security, I will remain liable for any unauthorized use of TD AMERITRADE's online service until TD AMERITRADE receives actual notice from me and until my account is canceled.

4.4 TD AMERITRADE shall not be deemed to have received any order or instruction transmitted by me until TD AMERITRADE has actual knowledge of the order or instruction. All orders or instructions shall be deemed to be made in the form received by TD AMERITRADE.

**New York Stock Exchange Rule 382 Disclosure**

This disclosure is provided to inform you of the allocation of responsibilities between TD AMERITRADE, Inc. ("TD AMERITRADE") and its clearing affiliate, National Investor Services Corp. ("NISC"). TD AMERITRADE has designated NISC as its clearing agent to handle the record keeping, clearance, and settlement functions for its clients' accounts pursuant to a written agreement. Please note that you will have a direct relationship with TD AMERITRADE; the clearing services to be provided by NISC will not alter that relationship.

TD AMERITRADE, as your broker, will be responsible for the following with respect to your account:

• Opening, approving, and monitoring your account, including obtaining and verifying account information;
• Accepting and transmitting your orders, including responsibility for accepting or rejecting orders, procedures for screening orders prior to execution, transmission of your orders and the supervision of investment consultants (registered representatives) in accordance with TD AMERITRADE policies and applicable federal, state, and industry regulations;
• Prompt communication of instructions to NISC involving your account, including instructions for the transfer or delivery of securities, disbursement of funds from your account, and instructions regarding tender or exchange offers involving securities in your account;
• Prompt transmission to NISC of cash and securities delivered to TD AMERITRADE for credit to your account;
• General supervision of your account, including compliance with Rule 3010 of the National Association of Securities Dealers;
• Responding to any inquiries or complaints that you may have concerning your account and providing prompt notification to NISC of any complaints or inquiries involving NISC. NISC, as clearing broker, will be responsible for the following with respect to your account:

• Maintaining books and records which detail transactions in your account, and preparing and sending confirmations and statements reflecting purchases and sales of securities and related activity in your account, including receipt and delivery of monies or securities and the collection and distribution of dividends;
• Providing extensions of credit to you in compliance with Regulation T of the Federal Reserve Board, the regulations of the New York Stock Exchange and National Association Securities Dealers, and other self regulatory organizations, determining margin maintenance requirements, paying and charging interest, and rehypothecation or loan of any of your margin securities;
• Distributing shareholder information, including proxy material, tender offers, or any similar materials received by NISC, and providing various records on your behalf as required by applicable laws and regulations;
• Safeguarding your funds and securities: The securities in your TD AMERITRADE brokerage account are protected up to $150 million per client— as defined by the rules of Securities Investor Protection Corporation (SIPC), including up to $1 million for cash. The first $500,000 of coverage is provided by SIPC, of which up to $100,000 covers cash. A SIPC explanatory brochure is available upon request by calling 1-800-934-4448 or online at sipc.org. The remaining $149.5 million coverage (including up to $900,000 cash) is provided through Lloyd's of London, subject to an aggregate limit of $250 million. Please note that this account protection does not protect against losses due to market fluctuation.

## TD AMERITRADE Electronic Funds Transfer Terms and Conditions

TD AMERITRADE offers an asset transfer service which provides for the transfer of funds from your checking or savings account to your TD AMERITRADE Brokerage or IRA pursuant to your online instructions via tdameritrade.com, or our touch-tone phone services.

Single, Joint, Custodian, Trust, IRAs, Investment Clubs, Partnerships, Corporate, LLCs, and LLPs are eligible for this service. Eligible IRAs include Traditional, Roth, Rollover and Coverdell Education Savings Accounts only. Ineligible accounts include Estate, Simple IRAs, SEP IRAs, QRPs, Money Purchase, and Profit-Sharing Plans, Retirement Trusts and Non-Profit Organization Accounts.

You may initiate individual fund transfers in minimum amounts of $100 and maximum amounts of $100,000. For IRAs you may initiate individual fund transfers in minimum amounts of $100 and maximum amounts equal to IRA contribution limits, which may be indexed for inflation. You are responsible for any over-contribution resulting from the use of this service.

You are able to complete one transaction per account, per day. Your funds will be available for investing in two (2) business days if you request a transfer before 3:30 p.m. ET on a normal business day, not including weekends and holidays. All credits will be reflected on your monthly brokerage account statement.

To change or cancel a transfer instruction, you must contact Client Service at 800-934-4448, before 3:00 p.m. ET.

Transferred funds will not be available for withdrawal for a period of five (5) business days, including the date of transfer. The funds will be credited as of the date received and may earn money market dividends according to the terms of your account. After-tax contributions to a qualified plan or 401(k) cannot be rolled over into an IRA and then rolled back over into a qualified plan in the future. TD AMERITRADE is not responsible for tracking pre-tax and after-tax contributions. It is suggested that you speak with your tax consultant or attorney before rolling assets over into an IRA.

Under certain circumstances, we may have to send a reversing or duplicate transfer entry in order to accomplish normal processing or to correct an error. You agree to allow us to process such entries, all of which will be reflected on your monthly brokerage account statement.

If we do not complete a transfer to your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:
• If, through no fault of ours, you do not have enough money in your account to make the transfer.
• If the system was not working properly and you knew about the breakdown when you started the transfer.
• If circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken.

Please note that your bank/financial institution may impose a fee or restrict your use of this service. Prior to mailing your completed Move Money application, you may want to verify that your bank/financial institution allows ACH withdrawals to be initiated by another institution. Additionally, TD AMERITRADE will impose a fee in the event that funds in your bank/financial institution are insufficient to cover your transfer request or returned for any other reason.

Your use of this service will signify your agreement to be bound by the foregoing terms and conditions which supplement the terms of any other agreements governing your      TD AMERITRADE Brokerage Account.

## TD AMERITRADE Traditional Individual Retirement Account Custodial Account Agreement (TD Bank USA, N.A. as Custodian)

(Under Section 408(a) of the Internal Revenue Code) Please save this agreement for future reference.
Article I
1.01 Except in the case of a rollover contribution described in section 402(c), 403(a)(4), 403(b)(8), 408(d)(3), or 457(e)(16), an employer contribution to a simplified employee pension plan as described in section 408(k) or a recharacterized contribution described in section 408A(d)(6), the Custodian will accept only cash contributions up to $4,000 for tax years 2005 through 2007, and $5,000 for 2008 and thereafter. For individuals who have reached the age of 50 before the close of the tax year, the

contribution limit is increased to $4,500 for 2005, $5,000 for 2006 and 2007, and $6,000 for 2008 and thereafter. For tax years after 2008, the above limits will be increased to reflect a cost-of-living adjustment, if any.

Article II

2.01 The Depositor's interest in the balance in the Custodial Account is nonforfeitable.

Article III

3.01 No part of the Custodial Account funds may be invested in life insurance contracts, nor may the assets of the Custodial Account be commingled with other property except in a common trust fund or common investment fund (within the meaning of section 408(a)(5)).

3.02 No part of the Custodial Account funds may be invested in collectibles (within the meaning of section 408(m)) except as otherwise permitted by section 408(m)(3), which provides an exception for certain gold, silver, and platinum coins, coins issued under the laws of any state, and certain bullion.

Article IV

4.01 Notwithstanding any provision of this agreement to the contrary, the distribution of the Depositor's interest in the Custodial Account shall be made in accordance with the following requirements and shall otherwise comply with section 408(a)(6) and the regulations thereunder, the provisions of which are herein incorporated by reference.

4.02 The Depositor's entire interest in the Custodial Account must be, or begin to be, distributed not later than the Depositor's required beginning date, April 1 following the calendar year in which the Depositor reaches age 70½. By that date, the Depositor may elect, in a manner acceptable to the Custodian, to have the balance in the Trust Account distributed in:

(a) A single sum; or

(b) Payments over a period not longer than the life of the Depositor or the joint lives of the Depositor and his or her designated beneficiary.

4.03 If the Depositor dies before his or her entire interest is distributed to him or her, the remaining interest will be distributed as follows:

(a) If the Depositor dies on or after the required beginning date and:

(i) the designated beneficiary is the Depositor's surviving spouse, the remaining interest will be distributed over the surviving spouse's life expectancy, as determined each year until such spouse's death, or over the period in paragraph 4.03(a)(iii) below, if longer. Any interest remaining after the spouse's death will be distributed over such spouse's remaining life expectancy as determined in the year of the spouse's death and reduced by 1 for each subsequent year, or, if distributions are being made over the period in paragraph 4.03(a)(iii) below, over such period.

(ii) the designated beneficiary is not the Depositor's surviving spouse, the remaining interest will be distributed over the beneficiary's remaining life expectancy as determined in the year following the death of the Depositor and reduced by 1 for each subsequent year, or over the period in paragraph 4.03(a)(iii) below if longer.

(iii) there is no designated beneficiary, the remaining interest will be distributed over the remaining life expectancy of the Depositor as determined in the year of the Depositor's death and reduced by one for each subsequent year.

(b) If the Depositor dies before the required beginning date, the remaining interest will be distributed in accordance with (i) below or, if elected or there is no designated beneficiary, in accordance with (ii) below:

(i) The remaining interest will be distributed in accordance with paragraphs 4.03 (a)(i) and 4.03 (a)(ii) above (but not over the period in paragraph 4.03(a)(iii), even if longer), starting by the end of the calendar year following the year of the Depositor's death. If, however, the designated beneficiary is the Depositor's surviving spouse, then this distribution is not required to begin before the end of the calendar year in which the Depositor would have reached age 70½. But, in such case, if the Depositor's surviving spouse dies before distributions are required to begin, then the remaining interest will be distributed in accordance with paragraph 4.03(a)(ii) above (but not over the period in paragraph 4.03(a)(iii), even if longer) over such spouse's designated beneficiary's life expectancy, or in accordance with 4.03(b)(ii) below if there is no such designated beneficiary. (ii) The remaining interest will be distributed by the end of the calendar year containing the fifth anniversary of the Depositor's death.

4.04 If the Depositor dies before his or her entire interest has been distributed and if the designated beneficiary is other than the depositor's surviving spouse, no additional contributions may be accepted in the account.

4.05 The minimum amount that must be distributed each year, beginning with the year containing the Depositor's required beginning date, is known as the "required minimum distribution" and is determined as follows:

(a) The required minimum distribution under paragraph 4.02(b) for any year, beginning with the year the Depositor reaches age 70½, is the Depositor's account value at the close of business on December 31 of the preceding year, divided by the distribution period in the uniform lifetime table in Regulations section 1.401(a)(9)-9. However, if the Depositor's designated beneficiary is his or her surviving spouse, the required minimum distribution for a year shall not be more than the Depositor's account value at the close of business on December 31 of the preceding year, divided by the number in the joint and last survivor table in Regulations section 1.401(a)(9)-9. The required minimum distribution for a year under this paragraph 4.05 (a) is determined using the Depositor's (or, if applicable, the Depositor and spouse's) attained age (or ages) in the year. (b) The required minimum distribution under paragraphs 4.03(a) and 4.03(b)(i) for a year, beginning with the year following the year of the Depositor's death (or the year the Depositor would have reached age 70½, if applicable under paragraph 4.03(b)(i)) is the account value at the close of business on December 31 of the preceding year divided by the life expectancy (in the single life table in Regulations section 1.401(a)(9)-9) of the individual specified in such paragraphs 4.03(a) and 4.03(b)(i). (c) The required minimum distribution for the year the Depositor reaches age 70½ can be made as late as April 1 of the following year. The required minimum distribution for any subsequent year must be made by the end of such a year.

4.06 The owner of two or more traditional IRAs may satisfy the minimum distribution requirements described above by taking from one traditional IRA the amount required to satisfy the requirement for another in accordance with the regulations under section 408(a)(6).

Article V

5.01 The Depositor agrees to provide the Custodian with all information necessary to prepare any reports required by section 408(i) and Regulation sections 1.408-5 and 1.408-6.

5.02 The Custodian agrees to submit to the Internal Revenue Service (IRS) and Depositor the reports prescribed by the IRS.

Article VI

6.01 Notwithstanding any other articles which may be added or incorporated, the provisions of Articles I through III and this sentence will be controlling. Any additional articles inconsistent with section 408(a) and the related regulations will be invalid.

Article VII

7.01 This agreement will be amended as necessary to comply with the provisions of the Code and the related regulations. Other amendments may be made with the consent of the persons whose signatures appear on the Adoption Agreement.

Article VIII

8.01 Representations and Responsibilities. The Depositor represents and warrants that any information provided with respect to this Agreement shall be complete and accurate. Further, the Depositor agrees that any directions given or actions taken will be proper under this Agreement and that the Custodian shall be entitled to rely on such information or directions. The Custodian shall not be responsible for losses of any kind that may result from the Depositor's directions, actions or failures to act, and the Depositor agrees to reimburse the Custodian for any loss it may incur as a result of such directions, actions or failures to act. The Custodian shall not be responsible for any taxes, penalties, judgments, or expenses incurred by the Depositor in connection with this IRA. The Custodian shall have no duty to determine whether contributions or distributions comply with the Code, regulations, rulings or this Agreement. The Depositor shall be responsible for all tax consequences originating from contributions to, and distributions from, this IRA, and acknowledges that no tax advice has been provided by the Custodian.

8.02 Accounting. The Custodian shall, at least annually, provide the Depositor or Beneficiary (in the case of death) with an accounting of such Depositor's account which accounting may consist of regularly issued brokerage statements. Such accounting shall be deemed to be accepted by the Depositor, if the Depositor or Beneficiary does not object in writing within 60 days after the mailing of such accounting statements.

8.03 Amendment. The Depositor irrevocably delegates to the Custodian the right and power to amend this Custodial Agreement. Except as hereafter provided, the Custodian will give the Depositor 30 days prior written notice of any amendment. In case of a retroactive amendment required by law, the Custodian will provide written notice to the Depositor of the amendment within 30 days after the amendment is made, or if later, by the time that notice of the amendment is required to be given under regulations or other guidance provided by the IRS. The Depositor shall be deemed to have consented to any such amendment unless the Depositor notifies the Custodian to the contrary within 30 days after notice to the Depositor and requests a distribution or transfer of the balance in the account.

8.04 Resignation and Removal of Custodian.

(a) The Custodian may resign and appoint a successor trustee or custodian to serve under this agreement or under another governing agreement selected by the successor trustee or custodian by giving the Depositor written notice at least 30 days prior to the effective date of such resignation and appointment, which notice shall also include or be provided under separate cover a copy of such other governing instrument, if applicable, and the related disclosure statement. The Depositor shall then have 30 days from the date of such notice to either request a distribution of the entire account balance or designate a different successor trustee or custodian and notify the Custodian of such designation. If the Depositor does not request distribution of the account balance or notify the Custodian of the designation of a different successor trustee or custodian within such 30-day period, the Depositor shall be deemed to have consented to the appointment of the Successor Trustee or Custodian and the terms of any new governing instrument, and neither the Depositor nor the successor shall be required to execute any written document to complete the transfer of the account to the Successor Trustee or Custodian. The Successor Trustee or Custodian may rely on any information, including beneficiary designations, previously provided by the Depositor to the Custodian.

(b) The Depositor may at any time remove the Custodian and replace the Custodian with a Successor Trustee or Custodian of the Depositor's choice by giving 30 days notice of such removal and replacement. The Custodian shall then deliver the assets of the account as directed by the Depositor. However, the Custodian may retain a portion of the assets of the IRA as a reserve for payment of any anticipated remaining fees and expenses, and shall pay over any remainder of this reserve to the Successor Trustee or Custodian upon satisfaction of such fees and expenses.

(c) The Custodian may resign and demand that the Depositor appoint a Successor Trustee or Custodian of this IRA by giving the Depositor written notice at least 30 days prior to the effective date of such resignation. The Depositor shall then have 30 days from the date of such notice to designate a Successor Trustee or Custodian, notify the Custodian of the name and address of the Successor Trustee or Custodian, and provide the Custodian with appropriate evidence that such successor has accepted the appointment and is qualified to serve as Trustee or Custodian of an individual retirement account.

(i) If the Depositor designates a Successor Trustee or Custodian and provides the Custodian evidence of the Successor's acceptance of appointment and qualification within such 30-day period, the Custodian shall then deliver all of the assets held by the Custodian in the account (whether in cash or personal or real property, wherever located, and regardless of value) to the Successor Trustee or Custodian.

(ii) If the Depositor does not notify the Custodian of the appointment of a Successor Trustee or Custodian within such 30-day period, then the Custodian may distribute all of the assets held by the Custodian in the account (whether in cash or personal or real property, wherever located, and regardless of value) to the Depositor, outright and free of trust, and the Depositor shall be wholly responsible for the tax consequences of such distribution. In either case, the Custodian may expend any assets in the account to pay expenses of transfer (including reregistering the assets and preparation of deeds, assignments, and other instruments of transfer or conveyance) to the Successor Trustee or Custodian or the Depositor, as the case may be. In addition, the Custodian may retain a portion of the assets as a reserve for payment of any anticipated remaining fees and expenses. Upon satisfaction of such fees and expenses, the Custodian shall pay over any remainder of the reserve to the Successor Trustee or Custodian or to the Depositor, as the case may be.

(d) The Custodian shall not be liable for any actions or failures to act on the part of a Successor Custodian nor for any tax consequences incurred by the Depositor as a result of the transfer or distribution of assets pursuant to this section.

8.05 Custodian's Fees and Expenses.

(a) The Depositor agrees to pay the Custodian any and all fees specified in the Custodian's current published fee schedule for establishing and maintaining this IRA, including any fees for distributions from, transfers from, and terminations of this IRA. The Custodian may change its fee schedule at any time by giving the Depositor 30 days prior written notice. In addition, the Depositor agrees to pay any brokerage commissions attributable to the purchase or sale of assets.

(b) The Depositor agrees to pay any expenses incurred by the Custodian in the performance of its duties in connection with the account. Such expenses include, but are not limited to, administrative expenses, such as legal and accounting fees, and any taxes of any kind whatsoever that may be levied or assessed with respect to such an account.

(c) All such fees, taxes, and other administrative expenses charged to the account shall be collected either from the assets in the account, or from any contributions to, or distributions from, such account if not paid by the Depositor, but the Depositor shall be responsible for any deficiency.

(d) In the event that for any reason the Custodian is not certain as to who is entitled to receive all or part of the Custodial Funds, the Custodian reserves the right to withhold any payment from the Custodial Account, to request a court ruling to determine the disposition of the Custodial Assets, and to charge the Custodial Fund for any expenses incurred in obtaining such legal determination.

8.06 Withdrawal Requests.

All requests for withdrawal shall be in writing on a form provided by the Custodian. Such written notice must also contain the reason for the withdrawal and the method of distribution being requested. Any withdrawals shall be subject to applicable tax and other laws and regulations including possible early withdrawal penalties and withholding requirements. If the Depositor is receiving periodic distributions, such Depositor may change a previous tax withholding election at any time with respect to future payments.

The Custodian's terms and conditions regarding distributions shall be extended to all mediums permitted pursuant to IRS regulations.

8.07 Age 701/2 Default Provisions.

If the Depositor does not choose any of the distribution methods under Article IV of this Custodial Agreement by April 1st following the calendar year in which the Depositor reaches age 701/2, distribution shall be determined based upon the distribution period in the uniform lifetime distribution period table in Regulation section 1.401(a)(9)-9. However, no payment will be made until the Depositor provides the Custodian with a proper distribution request acceptable to the Custodian. Upon receipt of such distribution request, the Depositor may switch to a joint life expectancy in determining the required minimum distribution if the Depositor's spouse was the sole beneficiary as of January 1st of the year that contains the Depositor's required beginning date and such spouse is more than 10 years younger than the Depositor.

8.08 Death Benefit Default Provisions.

(a) If the Depositor dies before his or her required beginning date and the beneficiary does not select a method of distribution described in Article IV, Section 4.03(b)(i) or (ii) by December 31 following the year of the Depositor's death, then distributions will be made pursuant to the single life expectancy of the Designated Beneficiary determined in accordance with IRS regulations. However, no payment will be made until the beneficiary provides the Custodian with a proper distribution request acceptable to the Custodian and other documentation that may be required by the Custodian. A beneficiary may at any time request a complete distribution of his or her remaining interest in the Custodial Account. The Custodian reserves the right to require a minimum balance in the account in order to make periodic payments from the account.

(b) If the Depositor dies on or after his or her required beginning date, distribution shall be made in accordance with Article IV, Section 4.03(a). However, no payment will be made until the beneficiary provides the Custodian with a proper distribution request acceptable to the Custodian and other documentation that may be required by the Custodian. A beneficiary may at any time request a complete distribution of his or her remaining interest in the Custodial Account. The Custodian reserves the right to require a minimum balance in the account in order to make periodic payments from the account.

8.09 Transitional Rule for Determining Required Minimum Distributions for Calendar Year 2002.

Unless the Custodian provides otherwise, if a Depositor (or beneficiary) is subject to required minimum distributions for calendar year 2005, such individual may elect to apply the 1987 proposed regulations, the 2001 proposed regulations, or the 2002 final regulations in determining the amount of the 2005 required minimum. However, the Custodian, in its sole discretion, reserves the right to perform any required minimum distribution calculations through its data systems or otherwise based upon any of the three sets of regulations delineated in the previous sentence.

8.10 Responsibilities.

(a) Depositor agrees that all information and instructions given to the Custodian by the Depositor is complete and accurate and that the Custodian shall not be responsible for any incomplete or inaccurate information provided by the Depositor or Depositor's beneficiary(ies). Depositor and Depositor's beneficiary(ies) agree to be responsible for all tax consequences arising from contributions to, and distributions from, this Custodial Account and acknowledges that no tax advice has been provided by the Custodian.

(b) Beneficiaries must provide the Custodian with a tax identification number prior to receiving any death payments from this traditional IRA.

(c) In the event the Depositor requests a rollover distribution or a trustee-to-trustee transfer, the Depositor shall be responsible for:

(1) tracking the type of assets received from another IRA, or employer's plan (include any "after-tax" monies being rolled from another plan to this IRA);

(2) determining whether a rollover or transfer of assets is a taxable event;

(3) assuring that all required paperwork of the delivering institution has been supplied to the transfer or plan prior to initiating a rollover or transfer;

(4) withdrawing any required minimum distributions prior to the initiation of a rollover or transfer of assets.

8.11 Designation of Beneficiary.

(a) Except as may be otherwise required by State law, in the event of the Depositor's death, the balance in the account shall be paid to the beneficiary or beneficiaries designated by the Depositor on a beneficiary designation form acceptable to, and filed with, the Custodian. The Depositor may change the Depositor's beneficiary or beneficiaries at any time by filing a new beneficiary designation with the Custodian. If no beneficiary designation is in effect, if none of the named beneficiaries survive the Depositor, or if the Custodian cannot locate any of the named beneficiaries after a reasonable search, any balance in the account will be payable first to the Depositor's surviving spouse listed on the Depositor's death certificate. If there is no surviving spouse, then the assets are payable to the Depositor's estate.

(b) If permitted under state law, and if the Custodian permits, in the event of the Depositor's death, any beneficiary may name a subsequent beneficiary(ies) to receive the balance of the account to which such beneficiary is entitled upon the death of the original beneficiary by filing a Subsequent Beneficiary Designation Form acceptable to and filed with the Custodian. Payments to such subsequent beneficiary(ies) shall be distributed in accordance with the payment schedule applicable to the original beneficiary or more rapidly if the subsequent beneficiary requests. In no event can any subsequent beneficiary be treated as a designated beneficiary of the Depositor. The preceding sentence shall not apply with respect to the subsequent beneficiary(ies), if any, designated by the original spouse beneficiary where the Depositor dies before his or her required beginning date. In this case, the original spouse beneficiary is treated as the Depositor. If the balance of the account has not been completely distributed to

the original beneficiary and such beneficiary has not named a subsequent beneficiary or no named subsequent beneficiary is living on the date of the original beneficiary's death, such balance shall be payable to the estate of the original beneficiary. The Custodian makes no warranties or representations with respect to the applicability of this section.

8.12 Governing Law.

This Agreement shall be construed, regulated, and administered under the laws of the State of New York, and any court accounting shall be in the courts of New York.

8.13 Arbitration.

The Depositor agrees that all controversies which arise under this Agreement or in connection with the Depositor's account shall be governed by the Depositor's Client Agreement with the Broker. Notwithstanding any other provision in the document, any arbitration provision shall be subject to the interpretation of the Code and regulations thereunder.

8.14 Inquiries.

The Depositor authorizes the Custodian to furnish upon request (i) to the Broker all information relating to the Depositor's IRA and (ii) to the issuer of securities the Depositor's name, address, and securities positions relating to the securities of such issuer.

Article IX Self-Directed IRA Provisions

9.01 Investment of Contributions.

At the direction of the Depositor (or the direction of the beneficiary upon the Depositor's death), the Custodian shall invest all contributions to the account and earnings thereon in investments acceptable to the Custodian, which may include marketable securities traded on a recognized exchange or "over the counter" (excluding any securities issued by the Custodian), covered call options, Certificates of Deposit, and other investments to which the Custodian consents, in such amounts as are specifically selected and specified by the Depositor in orders to the Custodian in such form as may be acceptable to the Custodian, without any duty to diversify and without regard to whether such property is authorized by the laws of any jurisdiction as a Custodial Investment. The Custodian shall be responsible for the execution of such orders and for maintaining adequate records thereof. However, if any such orders are not received as required, or, if received, are unclear in the opinion of the Custodian, all or a portion of the contribution may be held uninvested without liability for loss of income or appreciation, and without liability for interest pending receipt of such orders or clarification, or the contribution may be returned. The Custodian may, but need not, establish programs under which cash deposits within parameters set by it will be periodically and automatically invested in a TD AMERITRADE, FDIC-insured Money Market Account. Cash deposits outside of these parameters may not be invested or may permit the Depositor to select among alternative investments funds made available by the Custodian for this purpose. The Custodian shall have no duty other than to follow the written investment directions of the Depositor, and shall be under no duty to question said instructions and shall not be liable for any investment losses sustained by the Depositor.

9.02 Registration.

All assets of the account shall be registered in the name of the Custodian or of a suitable nominee. The same nominee may be used with respect to assets of other investors whether or not held under agreements similar to this one or in any capacity whatsoever. However, each Depositor's account shall be separate and distinct; a separate account therefore shall be maintained by the Custodian, and the assets thereof shall be held by the Custodian in individual or bulk segregation either in the Custodian's vaults or in depositories approved by the Securities and Exchange Commission under the Securities Exchange Act of 1934.

9.03 Investment Advisor.

The Depositor may appoint an Investment Advisor, qualified under Section 3(38) of the Employee Retirement Income Security Act of 1974, to direct the investment of his IRA. The Depositor shall notify the Custodian in writing of any such appointment by providing the Custodian a copy of the instruments appointing the Investment Advisor and evidencing the Investment Advisor's acceptance of such appointment, an acknowledgment by the Investment Advisor that it is a fiduciary of the account, and a certificate evidencing the Investment Advisor's current registration under the Investment Advisor's Act of 1940. The Custodian shall comply with any investment directions furnished to it by the Investment Advisor, unless and until it receives written notification from the Depositor that the Investment Advisor's appointment has been terminated. The Custodian shall have no duty other than to follow the written investment directions of such Investment Advisor and shall be under no duty to question said instructions, and the Custodian shall not be liable for any investment losses sustained by the Depositor.

9.04 No Investment Advice.

The Custodian does not assume any responsibility for rendering advice with respect to the investment and reinvestment of Depositor's account and shall not be liable for any loss which results from Depositor's exercise of control over his account. The Custodian and Depositor may specifically agree in writing that the Custodian shall render such advice, but the Depositor shall still have and exercise exclusive responsibility for control over the investment of the assets of his account, and the Custodian shall not have any duty to question his investment directives.

9.05 Prohibited Transactions.

Notwithstanding anything contained herein to the contrary, the Custodian shall not lend any part of the corpus or income of the account to; pay any compensation for personal services rendered to the account to; make any part of its services available on a preferential basis to; acquire for the account any property, other than cash, from; or sell any property to, any Depositor, any member of a Depositor's family, or a corporation controlled by any Depositor through the ownership, directly or indirectly, of 50

percent or more of the total combined voting power of all classes of stock entitled to vote, or of 50 percent or more of the total value of shares of all classes of stock of such corporation.

9.06 Unrelated Business Income Tax.

If the Depositor directs investment of the account in any investment which results in unrelated business taxable income, it shall be the responsibility of the Depositor to so advise the Custodian and to provide the Custodian with all information necessary to prepare and file any required returns or reports for the account. As the Custodian may deem necessary, and at the Depositor's expense, the Custodian may request a taxpayer identification number for the account, file any returns, reports, and applications for extension, and pay any taxes or estimated taxes owed with respect to the account. The Custodian may retain suitable accountants, attorneys, or other agents to assist it in performing such responsibilities.

9.07 Disclosures and Voting.

The Custodian shall deliver, or cause to be executed and delivered, to Depositor all notices, prospectuses, financial statements, proxies and proxy soliciting materials relating to assets credited to the account. The Custodian shall not vote any shares of stock or take any other action, pursuant to such documents, with respect to such assets except upon receipt by the Custodian of adequate written instructions from Depositor.

9.08 Miscellaneous Expenses.

In addition to those expenses set out in Article VIII, section 8.05 of this plan, the Depositor agrees to pay any and all expenses incurred by the Custodian in connection with the investment of the account, including expenses of preparation and filing any returns and reports with regard to unrelated business income, including taxes and estimated taxes, as well as any transfer taxes incurred in connection with the investment or reinvestment of the assets of the account.

9.09 Nonbank Trustee Provision.

If the Custodian is a nonbank Trustee, the Depositor shall substitute another custodian or trustee in place of the Custodian upon receipt of notice from the Commissioner of the Internal Revenue Service or his delegate that such substitution is required because the Custodian has failed to comply with the requirements of Income Tax Regulations Section 1.408-2(e), or is not keeping such records, making such returns, or rendering such statements as are required by applicable law, regulations, or other rulings. The successor trustee or custodian shall be a bank, insured credit union, or other person satisfactory to the Secretary of the Treasury pursuant to Section 408(a)(2) of the Code. Upon receipt by the Custodian of written acceptance by its successor of such successor's appointment, Custodian shall transfer and pay over to such successor the assets of the account (less amounts retained pursuant to Article VIII, Section 8.05 of the Custodial Agreement) and all records (or copies thereof) of the Custodian pertaining thereto, provided that the successor trustee or custodian agrees not to dispose of any such records without the Custodian's consent.

General Instructions — (Section references are to the Internal Revenue Code unless otherwise noted.)

Purpose of Form — Form 5305-A is a model custodial account agreement that meets the requirements of section 408(a) and has been preapproved by the IRS. A traditional individual retirement account (traditional IRA) is established after the form is fully executed by both the individual (Depositor) and the Custodian and must be completed no later than the due date (excluding extensions) of the individual's income tax return for the tax year. This account must be created in the United States for the exclusive benefit of the Depositor or his or her beneficiaries. Do not file Form 5305-A with the IRS. Instead, keep it with your records. For more information on IRAs, including the required disclosures the Custodian must give the Depositor, see Pub. 590, Individual Retirement Arrangements (IRAs).

Definitions:

Custodian. The Custodian must be a bank or savings and loan association, as defined in section 408(n), or any person who has the approval of the IRS to act as Custodian.

Depositor. The Depositor is the person who establishes the custodial account.

Identifying Number. The Depositor's Social Security number will serve as the identifying number of his or her IRA. An employer identification number (EIN) is required only for an IRA for which a return is filed to report unrelated business taxable income. An EIN is required for a common fund created for IRAs.

Traditional IRA for Non-working Spouse. Form 5305-A may be used to establish the IRA Custodial Account for a non-working spouse. Contributions to an IRA Custodial Account for a non-working spouse must be made to a separate IRA Custodial Account established by the non-working spouse.

Specific Instructions —

Article IV. Distributions made under this article may be made in a single sum, periodic payment, or a combination of both. The distribution option should be reviewed in the year the Depositor reaches age 701/2 to ensure that the requirements of section 408(a)(6) have been met.

Article VIII. Article VIII and any that follow it may incorporate additional provisions that are agreed to by the Depositor and Custodian to complete the agreement. They may include, for example, definitions, investment powers, voting rights, exculpatory provisions, amendment and termination, removal of the Custodian, Custodian's fees, state law requirements, beginning date of distributions, accepting only cash, treatment of excess contributions, prohibited transactions with the Depositor, etc. Attach additional pages if necessary.

Traditional/Roth IRA Financial Disclosure — In General.

IRS regulations require the Custodian to provide you with the financial projected growth of your Traditional/ Roth IRA based upon certain assumptions.