**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH WELCH, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TD AMERITRADE HOLDING CORPORATION, TD AMERITRADE, INC, TD BANK USA, N.A. and THE TORONTO-DOMINION BANK,<br><br>Defendants. | **Civ. No. 07-6904 (RJS)**<br><br>**ECF CASE** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**

**SCHOENGOLD SPORN LAITMAN & LOMETTI, P.C.**

Samuel P. Sporn (SS-4444)
Joel P. Laitman (JL-8177)
Jay P. Saltzman (JS-7335)
Frank R. Schirripa (FS-1960)
Daniel B. Rehns (DR-5506)
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046

*Counsel for the Plaintiff*

# TABLE OF CONTENTS


I. INTRODUCTION ........................................ 1

II. FACTUAL ALLEGATIONS ........................................ 3

III. FACTUAL ALLEGATIONS SET FORTH IN THE COMPLAINT GIVE RISE TO WELL-PLED STATE AND FEDERAL CLAIMS ........................................ 5

A. Breach of Fiduciary Duty Claim ........................................ 6

B. Plaintiff's Remaining Common Law Causes of Action Are Well-Pled ........................................ 8

1. Defendants' Argument That The Alleged Misrepresentations And Omissions Were Mere "Puffery" Is Without Merit ........................................ 9

2. Defendants' Argument That Their "Benefits" Misrepresentations And Omissions Are Not Actionable Is Without Merit ........................................ 10

3. Defendants' Argument That Their Use of The Term "Money" Market Account" Is Not Actionable is Without Merit ........................................ 11

4. The Parent And Bank Defendants' Roles Are Sufficiently Pled ........................................ 12

5. Plaintiff's Negligence Claims Do Not Rely On The Existence of A Private Right of Action Under NYSE and NASD Rules ........................................ 14

C. Plaintiff's Claims Under the Investment Advisers Act Have Been Clearly Alleged ........................................ 15

D. A Claim Under New York GBL Section 349 Has Been Well-Pled ........................................ 16

IV. DEFENDANTS PUT FORTH NO GROUNDS FOR THE PREEMPTION OF PLAINTIFF'S STATE LAW CLAIMS ........................................ 17

V. PLAINTIFF'S DECISION TO NOT PARTICIPATE IN THE TDA CASH MANAGEMENT SWEEP PROGRAM AFTER THE FILING OF THE DEBLASIO ACTION BOLSTERS ALLEGATIONS OF DECEPTION RATHER THAN MANDATES DISMISSAL OF THE WITHIN ACTION ........................................ 18

VI. CONCLUSION ........................................ 20

# TABLE OF AUTHORITIES

**FEDERAL & STATE CASE LAW**

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC,*
Civ. No. 01-11448, 2005 U.S. Dist. LEXIS 21605 (S.D.N.Y. Sept. 26, 2005)...........18, 19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007) .....................................................................................16

*Bell Atl. Corp. v. Twombly,*
__ U.S. __, 127 S. Ct. 1955 (2007) ..........................................................................5

*Bissell v. Merrill Lynch & Co.,*
937 F. Supp. 237 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998) ............................8

*Camarillo v. Carrols Corp*.,
Civ. No. 06-4909, 2008 U.S. App. LEXIS 2814 (2d. Cir. Feb. 8, 2008) ........................ 5-6

*Chee v. Marine Midland Bank, N.A.,*
Civ. No. 88-0557, 1991 U.S. Dist. LEXIS 1151 (E.D.N.Y. Jan. 29, 1991) ........................7

*De Kwiatkowski v. Bear, Stearns & Co.,*
306 F.3d 1293 (2d Cir. 2002) ..................................................................................6

*Foman v. Davis,*
371 U.S. 178 (1962)..................................................................................................20

*Glenoit Mills, Inc. v. Miss Bobbie Originals, Inc.,*
Civ. No. 93-5494, 1994 U.S. Dist. LEXIS 6618 (S.D.N.Y. May 18, 1994)......................20

*Granite Partners L.P. v. Bear Stearns & Co.,*
17 F. Supp. 2d 275 (S.D.N.Y. 1998) .......................................................................18

*Komanoff v. Mabon, Nugent & Co.,*
884 F. Supp. 848 (S.D.N.Y. 1995) ..........................................................................15

*Kramer v. Unitas,*
831 F.2d 994 (11th Cir. 1987) ...................................................................................7

*Levitin v. PaineWebber, Inc.,*
159 F.3d 698 (2d Cir. 1998) .......................................................................................7

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
446 F. Supp. 2d 163 (S.D.N.Y. 2006) .........................................................................8

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
507 F.3d 118 (2d. Cir. 2007)........................................................................... 5-6

*SEC v. Capital Gains Research Bureau, Inc.*,
375 U.S. 180 (1963) ..........................................................................................15

*In re Solomon Smith Barney Mut. Fund Fees Litig.*,
528 F. Supp. 2d 332, 2007 U.S. Dist. LEXIS 91451 (S.D.N.Y. 2007) ............................16

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)..............................................................................................9

*United States v. Santoro*,
302 F.3d 76 (2d Cir. 2002)......................................................................................9

*United States v. Skelly*,
442 F.3d 94 (2d Cir. 2006) .....................................................................................6

**STATUTES & RULES**

12 U.S.C. §§ 21 to 216d (2008).................................................................................18

12 U.S.C. §§ 4301 to 4313 (2008)............................................................................18

15 U.S.C. § 78a *et seq*.........................................................................................8, 18

15 U.S.C. § 78bb.....................................................................................................17

15 U.S.C. §§ 80b-1 to 80b-21 ...................................................................................2

17 C.F.R. § 240.15c3-2 (2007) ...............................................................................8, 18

17 C.F.R. § 240.15c3-3 (2007) ...............................................................................8, 18

N.Y. Gen. Bus. Law § 349 (McKinney 2004) .............................................................2

N.Y. Gen. Bus. Law §§ 352 to 359-h (McKinney 1996 & Supp. 2007) ......................................18

**OTHER AUTHORITIES**

*Customer Account Sweeps to Banks*,
NYSE Information Memo 05-11 (Feb. 15, 2005).......................................................5, 18

## I. INTRODUCTION

Plaintiff Joseph Welch ("Plaintiff") respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss Plaintiff's Complaint (the "Complaint" or "SAC") of defendants TD Ameritrade Holding Corporation ("TDA Holding" or "Parent Defendant"), TD Ameritrade, Inc. ("TD Ameritrade" or "Securities Firm Defendant"), TD Bank USA, N.A. ("TD Bank") and The Toronto-Dominion Bank ("Toronto-Dominion")[1] (collectively, the "TDA Defendants," "TDA" or "Defendants"). It is alleged that Defendants engaged in a deceptive and fraudulent common plan and scheme whereby Defendants, under the guise of providing a "great" cash management "option" for clients, changed the prior practice of TD Waterhouse of having clients' uninvested cash swept into high yield money market funds ("MMFs") yielding up to 4%-5% to a program where TDA clients with lesser assets would have their cash automatically deposited into savings accounts at TD Bank earning interest as low as 0.10%. In implementing the scheme, Defendants were careful not to describe these bank accounts as either "bank accounts" or "savings bank accounts." Instead, Defendants used the term "money market accounts" ("MMA"), which most closely approximated the truly beneficial "money market funds." It is alleged that these sham MMAs or MMFs, earning interest as little as 0.10% were not in any way a "great" cash investment "option" for TDA clients as had been represented and were only deployed in order for Defendants to obtain massive undisclosed profits.

Defendants' profits were derived from the fact that that while MMFs precluded Defendants from using client cash for their own profit, client cash held in TDA-affiliated and -controlled TD Bank had no such limitation. The sham money market funds thus provided

[1] TD Bank is a wholly owned subsidiary of Toronto-Dominion Bank, both of which are collectively referred to herein as the "Bank Defendants."

Defendants in fiscal 2006 alone with instant liquidity in excess of $5 billion – with zero borrowing costs – which in turn was used to generate $185 million or 26% of TDA's 2006 net profit. This plan and scheme gives rise to state and federal causes of action for fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty by the Parent and Bank Defendants, common law fraud, negligence, negligent misrepresentation, unjust enrichment, breach of contract and violations of the Investment Advisors Act of 1940 ("IAA"), 15 U.S.C. §§ 80b-1 to 80b-21, and New York's General Business Law ("GBL") § 349 (McKinney 2004). (¶¶ 255-260).[2]

In seeking dismissal, Defendants rely on arguments which run contrary to the fundamental principles governing motions to dismiss. Defendants argue that the Court should find immaterial as a matter of law Defendants' specific alleged misrepresentations touting the BDP as financially beneficial to their clients; that the Court should find other alleged misrepresentations concerning, for example, disclosures of "Benefits" to TDA, not misleading as a matter of law; and that the Court should consider documents and other Plaintiff accounts which are not referenced in the pleading (Declaration of Matthew D. Stratton in Support of Defendants' Motion to Dismiss ("Stratton Decl.") Exs. J, K, L, M) and for which a BDP was not imposed, in order to find that, as a matter of law, Plaintiff was not "duped" by the scheme. These arguments fail since the misrepresentations specifically furthered the scheme alleged and thus were not merely immaterial "puffery"; the disclosures, including the purported disclosure of "Benefits," contained numerous material omissions and misleading statements which by themselves raise

---

[2] As the Court is aware, similar allegations have been pled against various financial entities that have moved to dismiss the allegations of the Second Amended Complaint filed in the action captioned *DeBlasio v. Merrill Lynch, et al.*, Civ. No. 07-318 (RJS). As per this Court's instructions in the December 18, 2007 conference, for the Court's convenience, Plaintiff has incorporated by reference specific legal arguments made in plaintiffs' Joint Brief in Opposition to defendants' motions for dismissal in the *DeBlasio* action. Such references are denoted by "*DeBlasio* Opp. Br. at __."

sufficient factual issues to preclude dismissal; and Plaintiff's changes to his account and opening of other accounts ***after*** the *DeBlasio* action was filed in fact show that Plaintiff sought to rid himself of the BDP and only supports the allegations that he *was duped*. In all events, the arguments Defendants raise regarding Plaintiff's other accounts are based on documents which are well outside the pleading and should not be addressed by this Court on a motion to dismiss.

## II. FACTUAL ALLEGATIONS

It is alleged that in or around January 2006, following the acquisition of TD Waterhouse by Ameritrade Holding, TDA made representations to its clients emphasizing its commitment to providing services and guidance that furthered the clients' financial interests. (¶¶ 47). For example, TDA stated "*whatever level of support and education you need to help pursue your financial goals, you'll find it at TD Ameritrade*" and also averred that "*we provide an extensive array of education and services to empower your trading and investing plan.*" *Id.* TDA also emphasized that the services and guidance it provided were independent and unbiased, stating, for example, "*because we don't sell products that carry our name, you can count on* ***unbiased market information*** *to power your investment strategy*" and that, at TDA, clients "*find a wide range of practical solutions,* ***impartial guidance and service*** *to help you create a path to your long term goals…all at a great value.*" *Id.* One of the specific services TDA touted as a "***great option***" for its clients was its program for investing client cash. However, in fact this program was far from "unbiased" and "impartial." (¶¶ 50-51). Indeed, the program was designed and implemented for a single purpose: to enable the TDA Defendants to obtain undisclosed windfall profits at their clients' expense. (¶¶ 46, 60, 64-65). TDA implemented the BDP, whereby client cash held in accounts below certain minimums were automatically swept not into MMFs yielding 4-5%, as had been the prior TD Waterhouse practice, but rather into savings bank

accounts at the Bank Defendants earning interest as low as ***0.10%***. (¶ 54). Plaintiff's uninvested cash was swept into a TD Bank "Money Market Account" ("MMA") yielding 0.25%. (¶¶ 10, 30; *see also*, Stratton Decl. Ex. N).

The dimensions of the TDA Defendants' financial windfall from the implementation of this program are difficult to overstate – exceeding $5 billion in 2006. (¶¶ 5, 35). This massive undisclosed financial gain was only achieved through Defendants' capitalization on the wholly undisclosed spread between savings accounts rates and MMF yields. Money market funds are primarily composed of safe, short-term debt instruments such as those issued by the U.S. Treasury. Furthermore, MMFs are required by law to maximize yields for all its investors equally – thus, a brokerage firm offering an investment in an MMF may not base the yield for an individual investor on the amount of money he has invested in the fund. (¶¶ 25). Further, the cash held in such funds are held in trust – they cannot be used by the brokerage firm for its own profit. Bank savings accounts, on the other hand, (particularly those at a bank controlled by TDA) have neither of the above limitations. *Id*. Specifically, the cash swept into TD Bank immediately became part of TDA's balance sheet and could be used for TDA's own profit; further, TDA was free to maximize its own profit by minimizing the interest paid to clients with lesser assets. (¶¶ 4, 6, 28, 34, 36, 51, 59, 64, 70). Thus, by implementing the bank deposit program in 2006, TDA not only obtained instant liquidity of $5 billion with no borrowing costs, but was also able to dramatically increase its own revenue and profit from the investment of those funds. *Id*.

It is alleged that the deceptive BDP rested on a series of materially false and misleading statements and critical non-disclosures. First, in each of the clients' monthly account statements, the savings bank account into which cash was automatically being swept was described as a

"*money market account,*" permitting easy confusion with the far more beneficial MMF. (¶¶ 2, 4, 50-56). Second, the money market account was touted as a "great option" for clients. (¶¶ 4, 49-50, 65). Third, in describing the BDP, Defendants were careful never to disclose that the reason the BDP was implemented was because MMFs prohibited Defendants' use of the cash for their own profit while paying a lesser financial return to those clients holding accounts with lesser assets. (¶ 4). Fourth, in describing TDA's benefits from the BDP, Defendants were careful never to disclose or even approximate either their massive profits or that those profits were obtained at their clients' expense – *i.e.*, only as a result of subjecting their clients to a cash management program adverse to those clients' financial interests. (¶¶ 6, 45).

It is further alleged that the Defendants' false and misleading statements were directly contrary to the February 2005 New York Stock Exchange Information Memorandum ("IM 05-11"). (¶¶ 41-45). IM 05-11 directed that brokerage firms disclose their expected range of compensation and that MMFs must maximize yields for ***all*** shareholders, regardless of the size of any individual investor's interest in the fund. (¶¶ 25, 41-45). In contrast, Defendants' BDP accounts never paid interest rates above the amount set by the Defendants themselves, all while the Defendants were incentivized to pay clients as little interest as possible so as to maximize their own financial returns and not their clients'. (¶¶ 38, 46, 49, 58, 64-65, 70, 82, 89).

## III. FACTUAL ALLEGATIONS SET FORTH IN THE COMPLAINT GIVE RISE TO WELL-PLED STATE AND FEDERAL CLAIMS

It is well-settled that to survive on a motion to dismiss, the factual allegations in a complaint need only be sufficient "to raise a right to relief above the speculative level." *Camarillo v. Carrols Corp*., Civ. No. 06-4909, 2008 U.S. App. LEXIS 2814, at *6 (2d. Cir. Feb. 8, 2008) (citing *Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1965 (2007)); *see also, Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 118, 121 (2d. Cir. 2007) ("the

plaintiff's factual allegations must give fair notice of what the claim is and the grounds upon which it rests"). Further, in evaluating the sufficiency of the pleading, the allegations of the complaint are taken as true and all reasonable inferences are to be drawn in the plaintiff's favor. *Camarillo*, 2008 U.S. App. LEXIS 2814, at *3. When these principles are applied to the pleading here it is clear that the allegations give rise to claims well beyond a "speculative level."

**A. Breach of Fiduciary Duty Claim**

As set forth in the *DeBlasio* Opp. Br. at 22, Second Circuit authority states that the determination of the existence of fiduciary duties between clients and financial firms turns on the specific services and functions the firms provide to the client. Where a financial firm merely executes client-directed trades, no fiduciary relationship exists. *De Kwaitkowski v. Bear, Stearns & Co.*, 306 F.3d 1293 (2d Cir. 2002). However, that is not the case where the client entrusts her assets to the custody and control of the firm with the expectation that the firm will invest those assets primarily for the benefit of the client. *See, e.g., United States v. Skelly*, 442 F.3d 94 (2d Cir. 2006). Here, it is clearly alleged that TDA clients entrusted their uninvested cash to TDA's control with the expectation that TDA would invest that cash primarily for the benefit of the client – and not for itself. Furthermore, TDA has full discretion to determine clients' financial return.

TDA argues that it cannot, as a matter of law, be found to owe Plaintiff a fiduciary duty since it is a "discount broker" and Plaintiffs have not alleged they delegated to TDA any discretionary authority. (TDA Ind. Br. at 13). Both arguments are without merit. First, in contrast with the cases upon which Defendants rely, the sweep program did not consist of client-

directed transactions – rather, it was devised, implemented and sustained by TDA.[3] Further, unlike a client-directed trade, here TDA had complete discretion as to the financial return its clients received on their uninvested cash.[4] (¶ 90; *DeBlasio* Opp. Br. at 2-3, 16).

Defendants also argue that *Levitin v. Paine Webber, Inc.*, 159 F.3d 698 (2d Cir. 1998), expressly permits the fraudulent scheme alleged. (TDA Ind. Br. at 2, 11). However, as set forth in the *DeBlasio* Opp. Br. at 21, 59, far from sanctioning this type of scheme, *Levitin* is inapposite to these facts. *Levitin* permitted a financial firm to invest for profit collateral provided by a client so that the client could execute trades on margin. *Levitin*, 159 F.3d at 702. Under these circumstances, the Second Circuit found there was no fiduciary duty requiring the firm to fully disgorge profits or disclose its profits from investing the collateral since the collateral was conveyed to the investment firm, as a creditor, by the client, as a debtor. (*Id*., at 698; see also, *DeBlasio* Opp. Br. at 59). There was no representation made or practice in the industry suggesting the firm would invest the collateral for the clients' benefit. *Id.* Here, the opposite is the case: not only did Defendants represent that they would act "impartially" and "objectively" in the interests of their clients, but Defendants also touted their BDP as being a "great" cash management option, and the historical practice of TD Waterhouse (the predecessor entity) as

---

[3] *Cf., Chee v. Marine Midland Bank, N.A.*, Civ. No. 88-0557, 1991 U.S. Dist. LEXIS 1151 (E.D.N.Y. Jan. 29, 1991) (no fiduciary owed by defendants whose only involvement in plaintiff's investments was the execution buy and sell orders at the plaintiff's direction).

Moreover, contrary to Defendants' contentions, the decision in *Kramer v. Unitas*, 831 F.2d 994 (11th Cir. 1987) (TDA Ind. Br. at 8, n.9), does not undermine Plaintiff's allegations. There, the court specifically held that "puffing [by a media celebrity]…***standing alone*** would not prove fraud." *Id*., at 998 (emphasis supplied). Here, in contrast, Defendants represented to the Class that they would receive "impartial" and "objective" service and "great options" in connection with the sweep accounts when in fact they fraudulently provided customers with adverse services in the form of extraordinarily low interest rates, and, moreover, TD Bank made kick-back payments to TD Ameritrade in the form of fees.

[4] TDA quotes its own disclosure which provides that the TDA Bank "will determine interest rates on the MMDA *in its discretion.*" (TDA Ind. Br. at 5).

well as the industry as a whole, was to invest the cash so as to provide a beneficial financial return to clients. (*DeBlasio* Opp. Br. at 6, 14).[5]

TDA argues that there can be no fiduciary duty since the client had complete freedom as to where to place his cash. (TDA Ind. Br. at 13). However, this is simply not the case for accounts with lesser assets, for which cash was automatically swept into misleading "money market accounts" at TD Bank. (¶¶ 2, 4, 24). As Defendants themselves concede, ***"a customer who meets certain minimum requirements*** may elect to have cash ***swept into a money market mutual fund."*** (TDA Ind. Br. at 4). Further, as alleged, non-sweep "alternative" investments were patently inferior since money is lost due to the time between each investment. (¶¶ 29-30, 57-58).[6]

Defendants also argue the aiding and abetting a breach of fiduciary duty claim against the Parent and Bank Defendants must fail because it is based on mere conclusory allegations. (TDA Ind. Br. at 18-19). This argument fails since the Parent and the Bank Defendants were the direct beneficiaries of the over $5 billion in cash, as well as profits (¶¶ 33, 35, 60); the Parent issued the

---

[5] The TDA Defendants also argue that the Exchange Act, 15 U.S.C. §§ 78a *et seq.*, Rule 15c3-2, 17 C.F.R. § 240.15c3-2 (2007), and Rule 15c3-3, 17 C.F.R. § 240.15c3-3 (2007), as well as *Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998), establish as a matter of law that there can be no fiduciary relationship arising from the Defendants' use of their clients' cash or "free credit balances." (TDA Ind. Br. at 12-13). However, as discussed more fully in the *DeBlasio* Opp. Br. at 71-77, SEC Rules 15c3-2 and 15c3-3 are limited in scope and purpose, and merely require quarterly notice to customers of their cash account balance and maintenance of "net capital" reserves. They expressly do not seek to regulate the overall legal rights and obligations between financial advisors and their clients based on specific representations. Similarly, *Bissell*, related to a firms' use of collateral that had been provided by their clients for the purpose of margin trading. Thus, in neither *Bissell*, nor the previously discussed *Levitin*, do the defendant firms promote their use of client collateral as financially beneficial to their clients. Thus, these cases have no relevance to the specific facts pled in this action.

[6] Defendants argue that Nebraska law should apply since it is the choice of law identified in Plaintiff's agreements with TD Ameritrade. (TDA Ind. Br. at 12, n.15). However, as Defendants concede, Nebraska law is substantially similar to that of New York in connection with fiduciary duty. *Id.* Thus, without a substantive conflict, New York law should apply. *See, e.g.*, *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 191 (S.D.N.Y. 2006) ("In the absence of substantive difference…a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it") (citation omitted).

false statements on its website (¶¶ 47-62); and TD Bank made "kick-backs" in the form of fees to TD Ameritrade. (¶¶ 5, 33-34, 68).

**B. Plaintiff's Remaining Common Law Causes of Action Are Well-Pled**

The remaining common law claims of fraud, negligence and negligent misrepresentation include requirements that a complaint contain specific allegations of material misrepresentations and omissions, and breaches of duties of disclosure which caused economic damages or harm. (*DeBlasio* Opp. Br. at 39, 49, 54). Each of these elements has been satisfied here. The alleged misrepresentations and omissions are clearly identified with particularity and accompanied by explanations as to why each was false and misleading. (¶¶ 47-62). In addition, "materiality" has been sufficiently pled since a reasonable investor would clearly have deemed it important to know that Defendants implemented the scheme to achieve massive undisclosed windfall profits at their clients' expense. (¶¶ 38, 46, 49, 58, 64-65, 70, 82, 89). *TSC Indus., Inc. v. Northway, Inc.* 426 U.S. 438 (1976). Further, it is alleged that the Defendants owed duties to Plaintiff and the class beyond mere fiduciary duties. (*DeBlasio* Opp. Br. at 48-49). Under *United States v. Santoro*, 302 F.3d 76 (2d Cir. 2002), every broker has duties to execute trades in a reasonable manner and it is plainly not "reasonable" for a broker to invest their clients' funds in order to derive profit for themselves at their clients' expense.[7]

**1. Defendants' Argument That The Alleged Misrepresentations And Omissions Were Mere "Puffery" Is Without Merit**

Defendants argue that the Court must disregard and find immaterial as a matter of law all of Defendants' representations that the BDP was a "great option" for clients to invest their cash

[7] Moreover, as alleged, all broker-dealers have an independent duty under NASD regulations to place clients in only suitable investments and not in investments which profit the broker-dealer at their clients' expense. (¶¶ 38-40). Finally, Plaintiff and the class were clearly duped into participating in the alleged fraudulent scheme and would not have agreed to such a cash management program had Defendants' disclosures been full and complete.

and that TDA provides their clients impartial guidance and services. (TDA Ind. Br. at 8). Repeating the argument of the *DeBlasio* defendants, TDA argues that all of these statements were the mere "puff" of a salesman which no reasonable client should have believed to be truthful. *Id.* However, the statements here, unlike those generalized statements in the cases upon which the Defendants rely, are specific and directly contradicted by the misconduct alleged. (¶¶ 47-65).[8] Defendants tout financial services which support the clients' financial goals and that the BDP was a "great" cash management option when, in fact, the BDP was a scheme to achieve undisclosed windfall profits for TDA at their clients' expense. (¶¶ 4, 6, 28, 34, 36, 51, 59, 64, 70). The specific statements here relate to specific services purportedly provided to Plaintiff by Defendants and are rendered false by the particularized misconduct alleged in the Complaint.

### 2. Defendants' Argument That Their "Benefits" Misrepresentations And Omissions Are Not Actionable Is Without Merit

Defendants argue that the statements regarding the benefits of the BDP to TDA were fully truthful and contained no material omissions or misrepresentations. (TDA Ind. Br. at 11-12). On its face this is simply incorrect. The "Summary of Cash Balance Programs" makes the following statements about the "benefits" derived by TDA from the bank sweep program:

> **Benefits to TD Ameritrade and TD Bank USA, N.A.** TD Bank USA, N.A. used MMDA balances to fund current and new investment and lending activity. ***The Bank seeks to make a profit by achieving a positive spread between its cost of funds (e.g. deposits) and the return on its assets, net of expenses.***
>
> ***TD Ameritrade receives a fee from the Bank for marketing and related services in connection with the MMDA***. TD Ameritrade has the right to waive all or part of this fee. The fee is derived using a formula which results in the fee varying from month to month depending on the interest rate environment and the profitability of the Bank with respect to such deposits. As required by Federal Regulations, the fee the Bank pays TD Ameritrade does not exceed the amount that the Bank would offer in good faith to non-affiliated entities. The rate of the fee that TD Ameritrade receives may exceed the interest rate or effective yield that you receive in your MMDA. ***Other than the applicable fees we charge on***

[8] *See DeBlasio* Opp. Br. at 20, n.24.

> ***brokerage accounts, there will be no charges, fees or commissions imposed on your account for this cash sweep feature.***

(¶ 59; Stratton Decl. Ex. I, at 3) (emphasis added).

This "disclosure" gives no hint, much less meaningful disclosure, of TDA's true financial gains: it discloses neither the billions of dollars Defendants obtained in instant liquidity – with zero borrowing cost – nor the hundreds of millions of dollars in revenue and profit derived from investment of those funds. Instead, what is described is purposely vague and intended to mislead by conveying that the gains and benefits to TDA are limited. This "disclosure" states that TDA receives an unquantified or disclosed "fee" from the Bank Defendants. To further mislead clients, TDA also suggests it may not even obtain this undefined "fee" stating, "*TD Ameritrade has the right to waive all or part of this fee*," and that this fee is somehow capped by federal regulations in some amorphous undefined way: "*As required by Federal Regulations, the fee the Bank pays TD Ameritrade does not exceed the amount that the Bank would offer in good faith to non-affiliated entities*." (Stratton Decl. Ex. I, at 3). The implication of both of these statements was that the financial gain to TDA was limited. This, of course, is blatantly false and misleading given the true dimensions of the financial gain TDA obtained. Further, TD Bank, which "seeks to make a profit" by "achieving a positive spread," does not disclose any profit at all, much less disclose the windfall specifically alleged in the Complaint – *i.e.*, the $5 billion in cash in 2006 alone.

### 3. Defendants' Argument That Their Use of The Term "Money Market Account" Is Not Actionable Is Without Merit

Defendants argue that their account agreement clearly distinguishes between MMDAs and MMFs in its disclosures. (TDA Ind. Br. at 5-6). However, these "disclosures" are unavailing since they became effective one month *after* the action was filed and three months *after* the filing

of the *DeBlasio* action.[9] In all events, however, they were clearly misleading since they failed to disclose the most critical and material differences between the two types of accounts: that MMFs prohibited TDA from using client cash for its own profit or for any reason, while MMDA accounts permit TDA to profit from the use of client cash (¶ 4); and that MMFs must maximize yields for all shareholders equally, while MMDA gives TDA discretion to discriminate and pay little or no interest to some or all clients. (¶¶ 4-5, 25, 30, 33-34). What TDA does disclose about MMFs is decidedly negative and misleading. TDA states that the MMFs are not FDIC insured; are securities which "may increase or decrease in value"; and are "subject to restrictions, charges and expenses described in the prospectuses."

Defendants also argue that there was no deception as a matter of law since the term "Money Market Deposit Account" is defined under the federal securities regulations. (TDA Ind. Br. at 2, 8-10). This argument is also unavailing. First, it is alleged that TDA was careful to use not merely the term MMDA but also the MMA terminology in the account statements sent to Plaintiff. (Stratton Decl. Ex. N). The term "MMA" is *not defined* by federal regulation and thus TDA's efforts to hide behind a "regulatory definition" has no applicability to its use of this clearly deceptive term. However, in all events, the mere fact that MMDA is a defined term in federal regulations does not establish as a matter of law that *TDA's use* of that term was not misleading as a matter of law. The alleged context in which the MMDA term was used rendered it misleading. Here, while the prior practice had been to sweep uninvested cash into MMFs, TDA changed this practice and began to sweep their clients' uninvested cash into bank accounts

---

9 The only disclosures offered up by Defendants which include the definitions of both the MMA and MMDA sweep options are a purported Customer Agreement dated August 2007 (Stratton Decl. Ex. C) and two other suspicious disclosure documents, in what appears to be draft form, also dated August 2007 which, on their faces, do not appear to have ever been distributed to clients. (Stratton Decl. Ex. E, I).

labeled "*money market accounts,*" and claiming they were a "*great option*" for clients. (¶¶ 4, 49-50, 65).

### 4. The Parent And Bank Defendants' Roles Are Sufficiently Pled

Defendants argue that only TD Ameritrade can be liable for any false and misleading statements and omissions of fact since only statements attributed to that entity have been identified. (TDA Ind. Br. at 17). However, as set forth in the *DeBlasio* Opp. Br. at 112-13, where a defendant has directly participated in a scheme to defraud, liability does not require that defendant actually to have made any misrepresentation to the plaintiff. Here, the Complaint details how TD Ameritrade Holding, TD Bank and Toronto-Dominion directly participated in the execution of the fraudulent scheme. For example, the Complaint alleges that all the Defendants participated in the scheme by using their clients' cash to the detriment of the clients by paying a lower interest rate (of as low as 0.10%) and then investing those funds to earn as much as 10%. (¶¶ 4, 32-36). Moreover, the Complaint details how, as part of the acquisition of TD Waterhouse by Ameritrade, a multi-billion dollar bank was created when TD Holding agreed to provide a sweep of idle cash through TD Bank that TD Bank and Toronto-Dominion then would use for their own benefit rather than paying their customers more than a negligible interest rate. (¶¶ 32-33, 36). TD Ameritrade then received a "kick back" from TD Bank as a quid pro quo for funneling client funds to the Bank. (¶¶ 32-33).[10]

Defendants further argue that Plaintiff has not pled factual allegations which demonstrate direct reliance on the purported misrepresentations. (TDA Ind. Br. at 17-18). This argument

[10] This direct participation in the fraud and the tremendous benefit received by all of the Defendants also give rise to a strong inference of fraudulent intent. (*DeBlasio* Opp. Br. at 40). Here, it is alleged that Defendants implemented the BDPs by changing, for example, TD Ameritrade's practice of offering three taxable fund choices and thirteen money market funds at competitive rates. (¶¶ 31-33). Further, Defendants were motivated by the tremendous windfall that resulted from the implementation of the sweep program, including as much as $537 million in MMDA revenues for 2007. (¶ 35). Thus, there is no basis for the argument (TDA Ind. Br. at 18) that Plaintiff has failed to plead facts giving rise to a strong inference of fraudulent intent.

fails, as does the same argument made by the *DeBlasio* defendants. First, the alleged misrepresentations concerning the sweep program, for example, those related to "benefits," "FDIC insurance" and "alternatives," are found in the contractual documents or their subsequent amendments to the contractual documents – which Defendants argue *bind Plaintiff precisely because Plaintiff reviewed them.* (TDA Ind Br. at 5). Further, where a fraud is based on material omissions such as the failure to disclose Defendants' multi-billion dollar windfall, it is sufficient to allege a fiduciary duty or a duty to disclose. (*DeBlasio* Opp. Br. at 46).

Defendants also argue that lost future profits cannot be recovered for fraud. (TDA Br. at 18). However, as set forth in the *DeBlasio* Opp. Br. at 47-48, a fraud victim may recover, *inter alia*, the costs incurred in passing up other business opportunities, so long as he can establish a causal nexus between the fraud and the costs incurred. Plaintiff here has established the causal nexus between the fraudulent scheme Defendants perpetrated and the damages sustained: even more so than in the *DeBlasio* action, here, Plaintiff relied on Defendants' powerful false and misleading statements concerning the provision of "impartial guidance and service" (¶ 47) and "two great [sweep] options" (¶ 51) in opening his accounts and foregoing substantially more profitable business opportunities for his uninvested cash.[11]

### 5. Plaintiff's Negligence Claims Do Not Rely On The Existence of A Private Right of Action Under NYSE and NASD Rules

As do the *DeBlasio* defendants, the Defendants here mistake Plaintiff's allegations concerning Defendants' failure to comply with NYSE and NASD rules with the basis for a

11 Defendants argue that Plaintiff failed to allege that Defendants had a duty to disclose the omitted facts of the size of their windfall profits from the cash sweeps programs. (TDA Ind. Br. at 17). However, Defendants' representations and actions in the implementation and operation of its sweep program give rise to fiduciary relationships under Second Circuit precedent. *See, DeBlasio* Opp. Br. § IV. C. 3: Investment Advisors Act of 1940; *see also, United States v. Skelly, supra*.

private right of action. (TDA Ind. Br. at 19-20).[12] In fact, however, Plaintiff merely pleads that violation of NYSE and NASD rules is an indication of Defendants' breaches of their pre-existing duties to Plaintiff and the Class. (¶¶ 4, 37-46). In fact, courts have held that independent breach of contract claims for alleged violations of these rules and regulations may be maintained. (*DeBlasio* Opp. Br. at 60; *see also, Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848, 860 (S.D.N.Y. 1995)). Here, Defendants' violations of these rules is even more egregious given that they represented that they would provide beneficial customer support and "impartial guidance and service" to their clients. (¶ 47).

### C. **Plaintiff's Claims Under The Investment Advisers Act Have Been Clearly Alleged**

As set forth in the *DeBlasio* Opp. Br. at 34, the fundamental purpose behind the enactment of the IAA was "to eliminate, or at least expose, all *conflicts of interest which might incline an investment adviser...to render advice which was not disinterested*." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963). Here, Defendants had a significant financial interest in obtaining control over their clients' uninvested cash so that they, in turn, would be able to invest that cash for their own benefit at higher interest rates. Such conduct by the TDA financial advisors can hardly be viewed as "disinterested."

Defendants argue there is no IAA claim since they did not serve as an investment advisor to Plaintiff. (TDA Ind. Br. at 14-15). For the same reasons set forth in the *DeBlasio* Opp. Br. at

---

[12] Furthermore, courts have held that a negligence claim against a bank may be stated even where the relationship essentially is contractual, and negligence against a broker may be stated based on failure to evaluate suitability to invest. (*DeBlasio* Opp. Br. at 50). Moreover, according to Defendants' argument that negligence and unjust enrichment claims cannot stand where the relationship is ruled by a contract between the parties, it must be assumed that Plaintiff read and relied on said contract with TD Ameritrade. Further, Defendants' argument that Plaintiff's unjust enrichment claim must be dismissed because their relationship is contractual (TDA Ind. Br. at 20) fails because there was no contract between Plaintiff and TD Holding TD Bank or Toronto-Dominion. In addition, in connection with TD Ameritrade, matters concerning the material omissions of fact, for example, regarding Defendants' windfall profits, were not materially covered issues in the contracts and so an unjust enrichment claim is appropriate. (*DeBlasio* Opp. Br. at 62).

33-36, the TDA Defendants' implementation and operation of the Sweep Program has violated, and continues to violate, the IAA. Further, Defendants argue that they are immune from any IAA liability on the remaining three account because Plaintiff, albeit prudently, hired a third-party investment advisor in connection with two of his TD Ameritrade institutional accounts opened ***after*** he realized that Defendants had duped him. (TDA Ind. Br. at 14-15). However, this argument is without merit, since Defendants have not – nor can they – point to any legal authority to support this illogical "immunity" argument. Further, this argument is irrelevant, since, as set forth above, these two accounts were opened in May and September 2007, well ***after*** Plaintiff was alerted to the deceptive nature of Defendants' Sweep Program.

Finally, Defendants argue that no claim under the IAA is stated since it is not alleged that Plaintiff paid advisory fees to Defendants or received advice other than on matters incidental to trading. (TDA Ind. Br. at 14-15). However, as set forth in the *DeBlasio* Opp. Br. at 38, an IAA claim is stated where the advisor received fees, though such fees need not necessarily be paid directly by the Plaintiff. Further, Defendants' cash management services at issue in no way were incidental to the trading activity associated with Plaintiff's brokerage account, but rather were an inherent part of the advisory services provided by Defendants'.[13]

**D. <u>A Claim Under New York GBL Section 349 Has Been Well-Pled</u>**

Defendants' scheme to wrongfully profit from consumers' idle cash, all to consumers' detriment and Defendants' windfall benefit, is, contrary to Defendants' argument (TDA Ind. Br. at 20), exactly the type of "consumer-oriented" practices from which N.Y. GBL § 349 is

[13] Plaintiff requests that the Court take judicial notice of TD Ameritrade, Inc.'s Form ADV Uniform Application for Investment Adviser Registration filed with the SEC on or about November 30, 2007, annexed to the accompanying Declaration of Joel P. Laitman as Exhibit 1. It is well-settled that on a motion to dismiss, "[T]he Court may consider 'any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, ***legally required public disclosure documents filed with the SEC,*** and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *In re Solomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 2007 U.S. Dist. LEXIS 91451, at *9 (S.D.N.Y. 2007) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007)). (Emphasis added).

intended to protect consumers. Here, it could ot be clearer that Defendants sought to "sell" to consumers various financial services and marketed them to those consumers as providing "independent and objective research" and "impartial guidance and service." (¶ 47). In fact, Defendants not only failed to act "independently," "objectively" or "impartially," they actually steered clients to choices that were adverse to their interests as consumers. Indeed, they misleadingly told consumers that, in connection with the sweep program, there were "two great options" (¶ 51) when in fact, there were no real practical options other than taking whatever interest rate was offered by Defendants. (*DeBlasio* Opp. Br. at 63-67).[14]

## IV. DEFENDANTS PUT FORTH NO GROUNDS FOR THE PREEMPTION OF PLAINTIFF'S STATE LAW CLAIMS

As set forth in the *DeBlasio* Opp. Br. at 68, courts have repeatedly found that the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb ("SLUSA") does not apply in circumstances similar to here where the misconduct alleged did not relate directly to securities transactions. Neither cash nor bank deposit accounts are listed on a national exchange or issued by an investment company. As a result, neither are "covered securities" as defined under SLUSA. Moreover, the challenged transactions – *i.e.*, movement of client cash from their brokerage account to their bank account are not made "in connection with" purchases or sales of "securities," and thus is not a transaction that falls within the scope of SLUSA. Thus, Defendants' argument that Plaintiff's state law claims should be dismissed as are preempted by the SLUSA (TDA Ind. Br. at 15-16) must be rejected.

[14] Defendants' other arguments, that Plaintiff has not alleged actionable material misstatements or omissions or how he justifiably relied on Defendants' deceptive conduct (TDA Ind. Br. at 20), are without merit, as set forth *supra* at 9.

Similarly, Plaintiff's state law claims are not preempted by N.Y. GBL §§ 352 to 359h (the "Martin Act"). (TDA Ind. Br. at 17).[15] The Martin Act prohibits various fraudulent and deceitful practices in the distribution, exchange, sale and purchase of ***securities***. *See Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 292 (S.D.N.Y. 1998) (emphasis added); (*DeBlasio* Opp. Br. at 69-70). Therefore, similar to the reasons for SLUSA's inapplicability to the Plaintiff's claims, the Martin Act does not apply to the sweeping to client cash into savings accounts at the Bank Defendants because such transactions are not in securities.[16]

## V. PLAINTIFF'S DECISION TO NOT PARTICIPATE IN THE TDA CASH MANAGEMENT SWEEP PROGRAM AFTER THE FILING OF THE DEBLASIO ACTION BOLSTERS ALLEGATIONS OF DECEPTION RATHER THAN MANDATES DISMISSAL OF THE WITHIN ACTION

It is well-settled that on a motion to dismiss, a court is not to consider documents outside of the pleading which are not incorporated by reference in the Complaint, not SEC filings, and not relied upon by Plaintiff in bringing the within suit. *See, e.g., AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, Civ. No. 01-11448, 2005 U.S. Dist. LEXIS 21605, at *48-49 (S.D.N.Y. Sept. 26, 2005) (denying MTD claim as time-barred where Defendant relied on documents outside the pleadings). Defendants' argument contravenes well established principle by asking the Court to consider numerous documents concerning Plaintiff's accounts which are

[15] Defendants also argue that Plaintiff's state law claims conflict with various federal laws and regulations such as the Truth in Savings Act ("TISA"), 12 U.S.C. §§ 4301- 4313; the National Bank Act ("NBA"), 12 U.S.C. §§ 21- 216d; Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a, et seq. Rules 15c3-2, 17 C.F.R. § 240.15c3-2 (2007), and 15c3-3, 17 C.F.R. 15c3-3 (2007), *i.e.*, Exchange Act rules governing free credit balances; and NYSE Information Memo 05-11, *Customer Account Sweeps to Banks* (Feb. 15, 2005). (TDA Ind. Br. at 16-17). As set forth at length in the *DeBlasio* Opp. Br. at 68-83, these arguments are without basis.

[16] Defendants misrepresent Plaintiff's allegations in connection with TD Ameritrade's tiered interest rate structure. (TDA Ind. Br. at 10-11). A bank may pay interest on a tiered basis but where Defendants held themselves out as "impartial" and "objective" and providing "outstanding service," they cannot utilize the tiered interest structure to conceal the fact that they paid their least sophisticated investors the lowest interest rate while providing presumably more sophisticated investors a higher rate in order to execute the scheme. (*DeBlasio* Opp. Br. at 79).

not the subject of the allegations of the Complaint, and to then conclude after such consideration, that the Plaintiff was not "duped" by the alleged scheme. (TDA Ind. Br. at 7). Defendants' arguments should be rejected as contrary to established legal principles. *AIG Global Sec. Lending Corp.*, 2005 U.S. Dist. LEXIS 21605. Second, even if the Court does consider these documents, they actually support Plaintiff's allegations that he was duped by the Defendants' fraudulent scheme. For example, only one of Plaintiff's accounts with TD Ameritrade, out of the five cited to by Defendants, earned 0.25% interest. Not coincidentally, this was the account with the smallest balance. Once Plaintiff realized that only this account was receiving the *de minimis* interest rate, he requested that the account be aggregated with his larger accounts – which received the higher interest rate – the smaller account received a better rate. This provides strong evidence of Plaintiff's allegations that Defendants intended to take advantage of smaller clients while keeping larger accounts content and quiet and that once Plaintiff learned of the alleged misconduct, he changed his services. (¶¶ 30, 54).

Defendants argue that the fact that in February 2007 – ***after*** the *DeBlasio* complaint was filed – Plaintiff ensured that his uninvested cash would no longer be swept into the "money market account" earning interest of 0.25% but rather into a MMF establishes as a matter of law that Plaintiff was not duped.[17] In fact, the timing of Plaintiffs termination of the BDP actually bolsters his claim. It was only after the filing and publicity surrounding the *DeBlasio* complaint that he was given cause to carefully examine the MMA into which his cash was being swept and upon such examination immediately terminated the BDP. Defendants further argue that further evidence that the Plaintiff was not duped was the fact that Plaintiff opened two additional accounts after the *DeBlasio* complaint was filed – in May and September 2007, both of which

---

[17] Plaintiff obtained the money market option only after arguing his assets should be aggregated so as to provide him with the funds sufficient to make the money market fund alternative available.

were controlled by bona fide investment advisors – did not have cash swept into the BDP. (TDA Ind. Br. at 7). However, again, the fact that Plaintiff retained bona fide investment advisors ***after*** the *DeBlasio* action was filed who, for accounts having sufficient funds, ensured that his uninvested was ***not*** placed in TDA's BDP, bolsters the claim that with respect to the account for which there was no such advisor and which had less funds that, in fact, Plaintiff ***had been duped.*** Thus, once Plaintiff learned of the challenged conduct, he indeed chose a different product or service. Finally, the fact that two of Plaintiff's TD Waterhouse "legacy" accounts did in fact have sufficient funds as to permit any uninvested cash held in such accounts to be swept into MMFs does not impair the Plaintiff's claim or resulting injury suffered due to his uninvested cash being swept into a low-interest-bearing sweep account at the Bank Defendants.

## VI. CONCLUSION

For all of the foregoing reasons, Defendants' Motions to Dismiss the Complaint should be denied in its entirety.[18]

Dated: New York, New York
March 14, 2008

Respectfully submitted,

By: /s/ Joel P. Laitman
Samuel P. Sporn (SS-4444)
Joel P. Laitman (JL-8177)
Jay P. Saltzman (JS-7335)
Frank R. Schirripa (FS-1960)
Daniel B. Rehns (DR-5506)
**SCHOENGOLD SPORN LAITMAN & LOMETTI, P.C.**
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046

*Counsel for the Plaintiff*

---

[18] In the event that the Court dismisses any of the claims in whole or in part, Plaintiffs respectfully request an opportunity to replead since this is the first pleading to be reviewed by the Court in this matter. *Fed. R. Civ. P.* 15(a) (providing that leave to amend shall be granted freely); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also, Glenoit Mills, Inc. v. Miss Bobbie Originals, Inc.*, Civ. No. 93-5494, 1994 U.S. Dist. LEXIS 6618, at *18 (S.D.N.Y. May 18, 1994) (granting leave to replead where the "instant motion represents the first judicial review of the allegations[.]").